[No. S066747. Aug. 16, 1999.]

ASSOCIATED BUILDERS AND CONTRACTORS, INC., GOLDEN
GATE CHAPTER et al., Plaintiffs and Appellants, v.
SAN FRANCISCO AIRPORTS COMMISSION, Defendant and
Respondent;
SAN MATEO COUNTY BUILDING AND CONSTRUCTION TRADES
COUNCIL, AFL-CIO, Real Party in Interest and Respondent.

356

**COUNSEL**

Thierman Law Firm, Mark A. Thierman, George P. Parisotto, Robert Fried, Donald G. Ousterhout and Alice K. Conway for Plaintiffs and Appellants.

Chapman & Intrieri and Mark G. Intrieri for the Bay Area Black Contractors' Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Cox, Castle & Nicholson, John S. Miller and Herbert Jay Klein for Associated General Contractors of California, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jan S. Amundson, Quentin Riegel; Stephen A. Bokat, Susan Mahallati; Fred Main; Cook, Brown, Rediger & Prager and Dennis B. Cook for the National Association of Manufacturers, the Chamber of Commerce of the United States of America and the California Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Appellants.

Cook, Brown, Rediger & Prager, Dennis B. Cook and Jessavel Y. Delumen for the Hispanic Contractors Association, Sacramento Economic Empowerment Congress and Northern California Minority Trades Council as Amici Curiae on behalf of Plaintiffs and Appellants.

Louise H. Renne, City Attorney; Mara E. Rosales; Morrison & Foerster, Harold J. McElhinny, David K. Barrett and Sue C. Hansen for Defendant and Respondent.

N. Gregory Taylor, Marcia Scully, John C. Clairday; Morgan, Lewis & Bockius and Andrew C. Peterson for Metropolitan Water District of Southern California as Amicus Curiae on behalf of Defendant and Respondent.

Sherman, Dunn, Cohen, Leifer & Yellig, Victoria L. Bor; Altshuler, Berzon, Nussbaum, Berzon & Rubin and Peter D. Nussbaum for the Building and Construction Trades Department, AFL-CIO and the California State Building and Construction Trades Council, AFL-CIO as Amici Curiae on behalf of Defendant and Respondent.

Bartkiewicz, Kronick & Shanahan, Alan B. Lilly and David T. Sammond for Yuba County Water Agency as Amicus Curiae on behalf of Defendant and Respondent.

John R. Gallo, City Attorney (San Jose), Clifford S. Greenberg and Timothy S. Spangler, Deputy City Attorneys, for the City of San Jose and 13 California Cities as Amici Curiae on behalf of Defendant and Respondent.

Van Bourg, Weinberg, Roger & Rosenfeld, Victor J. Van Bourg, Sandra Rae Benson, Stanley S. Mallison and Theodore Franklin for Real Party in Interest and Respondent.

Morton H. Orenstein for Construction Employers Association, the Northern California Drywall Contractors Association, the Millwright Employers Association, the Modular Installers Association and the Western Steel Council as Amici Curiae on behalf of Defendant and Respondent and Real Party in Interest and Respondent.

## OPINION

**WERDEGAR, J.**—We granted review in this case to decide whether the project stabilization agreement (PSA) executed by defendant San Francisco Airports Commission (the Commission) and real party in interest San Mateo County Building and Construction Trades Council, AFL-CIO (the Trades Council), in order to accomplish the $2.4 billion expansion and renovation of the San Francisco International Airport, violates competitive bidding laws or certain other statutory or constitutional provisions.

The PSA involved in the present case exacts from the signatory unions over the expected 10-year life of the project a no-strike pledge, an agreement to arbitrate jurisdictional disputes among crafts, and a promise to continue work on the project despite the expiration of any applicable collective bargaining agreements. In exchange, the Commission agrees to require all contractors to accept the terms of the PSA, to abide by each craft's labor-management grievance procedure in cases of discipline or discharge, and to

use the union hiring hall for any new hires needed beyond the employer's own core workforce. Employers are also required to pay union wages and benefits.[1]

The PSA is an example of a type of prehire agreement designed for large and complex construction projects. It is designed to eliminate potential delays resulting from labor strife, to ensure a steady supply of skilled labor on the project, and to provide a contractually binding means of resolving worker grievances. Such agreements, also called project labor agreements, have long been used in large construction projects undertaken by both private concerns and, especially following the decision of the United States Supreme Court in *Building & Constr. Trades Council* v. *Associated Builders & Contractors of Mass./R. I., Inc.* (1993) 507 U.S. 218 [113 S.Ct. 1190, 122 L.Ed.2d 565] (*Boston Harbor*), public agencies. ▆ *Boston Harbor* held that the National Labor Relations Act (29 U.S.C. § 151 et seq.) (NLRA) does not preempt a public agency, acting as the owner of a construction project, from mandating an otherwise lawful project labor agreement as a bid specification for the project. (*Boston Harbor, supra,* at pp. 231-232 [113 S.Ct. at pp. 1198-1199].)

In order to protect the right of workers freely to choose their bargaining representatives, the NLRA generally prohibits prehire agreements. By enacting what is often called the construction industry proviso in 1959 (see 29 U.S.C. § 158(f)), however, Congress recognized that special conditions prevailing in the construction industry warrant an exception to the general rule. Because of the typically short-term and occasional nature of employment with any given employer in the construction industry, Congress determined that "[r]epresentation elections in a large segment of the industry are not feasible to demonstrate . . . majority status . . . ." (Sen.Rep. No. 187, 86th Cong., 1st Sess., p. 55 (1959), reprinted at 1 Nat. Lab. Relations Bd., Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (1985) pp. 451-452 (1 Legislative History); see *NLRB* v. *Iron Workers* (1978) 434 U.S. 335, 348-349 [98 S.Ct. 651, 659, 54 L.Ed.2d 586].) That is, a construction project might be completed and the workers dispersed to other jobs before a union could achieve certification through the often lengthy election process. Strikes, as an alternative to the election process, carried their own potentially extreme costs for both workers and employers. The construction industry developed its own solution to this problem, in the form of prehire agreements. As described in the Senate Report discussing the

---

[1]Because the airport project is subject to the prevailing wage law, however, employers on the project must, in essence, pay union wages regardless of the PSA. (See S.F. Charter, appen. A, § A7.204.)

1959 amendments to the NLRA: "In the building and construction industry it is customary for employers to enter into collective bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects are of relatively short duration, such labor agreements necessarily apply to jobs which have not been started and may not even be contemplated. . . . One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral. A substantial majority of the skilled employees in this industry constitute a pool of such help centered about their appropriate craft union. If the employer relies upon this pool of skilled craftsmen, members of the union, there is no doubt under these circumstances that the union will in fact represent a majority of the employees eventually hired." (Sen.Rep. No. 187, 86th Cong., 1st Sess., *supra*, p. 28, reprinted at 1 Legislative History, *supra*, at p. 424.) The construction industry provision of the NLRA (29 U.S.C. § 158(f)) removed any question regarding the legality, under federal labor law, of the standard prehire agreement, although it did not resolve other constitutional and state law issues such as those involved in the present case.

Bids for the international terminal contract, the largest contract in the airport expansion project, were due July 11, 1996. On that day, Associated Builders and Contractors, Inc., Golden Gate Chapter, and the Asian American Contractors Association, Inc. (AACA) (collectively, ABC), appeared in the San Francisco County Superior Court seeking a writ of mandate to strike the PSA requirement from the bid specifications, arguing the PSA is unconstitutional and violates state competitive bidding statutes. Following a hearing on the merits, the superior court denied the petition, ruling that the PSA is not unconstitutional and finding no inconsistency between the PSA and the competitive bidding laws. The Court of Appeal affirmed. That court held: the decision to use a PSA for the airport expansion project is a matter of local concern governed by San Francisco's Administrative Code rather than the California Public Contract Code; regardless of whether state or local law applied, the PSA does not violate competitive bidding laws; the PSA does not violate ABC's constitutional rights; and ABC lacks standing to assert violations of its workers' rights under the Labor Code.

We granted ABC's petition for review.

## DISCUSSION

*Standard of review*

On appeal from the denial of a writ of mandate, courts generally review an administrative agency's action under the substantial evidence test. We do not inquire whether, if we had the power to do so, we would have taken the action taken by the agency. (*Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 573-574 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*WSPA*); *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168] (*Fullerton*).) Rather, our authority is limited to determining whether the Commission's quasi-legislative action in adopting the PSA bid specification (see *20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216, 275 [8 Cal.4th 440d, 32 Cal.Rptr.2d 807, 878 P.2d 566]) was arbitrary, capricious, entirely lacking in evidentiary support, or procedurally unfair (*WSPA, supra*, at p. 574; *Fullerton, supra*, at p. 786; see also *Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 174 [36 Cal.Rptr.2d 521, 885 P.2d 934] (*Domar*) [applying deferential standard of review]). We exercise independent judgment, however, in determining whether the PSA is consistent with applicable law, such as the competitive bidding statutes. (See *Yamaha Corp. of America* v. *State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2].)

*Whether ABC has standing to challenge the PSA under competitive bidding laws*

Preliminarily, the Commission maintains ABC lacks standing to challenge the legality of the PSA under the competitive bidding laws. The Commission acknowledges it did not raise below all the arguments regarding standing it now presents in its brief, but observes that " 'contentions based on a lack of standing involve jurisdictional challenges and may be raised at any time in the proceeding.' (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 438 [261 Cal.Rptr. 574, 777 P.2d 610].)" We therefore proceed to consider whether ABC has standing to assert such a challenge on behalf of its members.

To establish associational standing, ABC must demonstrate that its members would otherwise have standing to sue in their own right. (*Brotherhood of Teamsters & Auto Truck Drivers* v. *Unemployment Ins. Appeals Bd.* (1987) 190 Cal.App.3d 1515, 1522 [236 Cal.Rptr. 78].) To have standing to seek a writ of mandate, a party must be "beneficially interested"

(Code Civ. Proc., § 1086), i.e., have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." (*Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].) This standard, as the Commission points out, is equivalent to the federal "injury in fact" test, which requires a party to prove by a preponderance of the evidence that it has suffered "an invasion of a legally protected interest that is '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' " (*Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville* (1993) 508 U.S. 656, 663 [113 S.Ct. 2297, 2301-2302, 124 L.Ed.2d 586].) ■■ The Commission contends both aspects are absent here, in that ABC has failed to establish the PSA excluded its members from consideration for contracts (*id.* at p. 666 [113 S.Ct. at p. 2303]) or that their compliance with the PSA would result in adverse economic consequences to them (*Associated Builders & Contractors* v. *Baca* (N.D.Cal. 1991) 769 F.Supp. 1537, 1541-1542).

ABC predicates its allegation of standing on a declaration by John Robinson, the Executive Director of the Golden Gate Chapter of Associated Builders and Contractors, Inc., stating that seven named members of Associated Builders and AACA refused to bid on the airport project due to the PSA specification. ABC also appears to rely on an allegation that, as citizens and taxpayers of this state, ABC's members have a beneficial interest in ensuring that no worker is denied access to employment on a public works project by the operation of the union hiring hall provisions of the PSA.

The Commission contends ABC's claim of associational standing must fail, because the Robinson declaration does not establish that ABC's members have bid in the past or have the necessary qualifications, such as a proper license, to submit a valid bid in the future. (See *Cornelius* v. *Los Angeles County etc. Authority* (1996) 49 Cal.App.4th 1761, 1771-1772, 1773 [57 Cal.Rptr.2d 618].) Further, ABC fails to allege its members would bid on contracts of the requisite size, since San Francisco's competitive bidding law applies only to contracts over $50,000 (S.F. Admin. Code, § 6.1), and its state counterpart applies only to contracts in excess of $4,000 (Pub. Contract Code, § 20121). ABC's claim of taxpayer standing similarly fails, the Commission argues, for lack of the requisite allegation the plaintiff is a "citizen resident [in the city or county], or . . . a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein." (Code Civ. Proc., § 526a.) Finally, ABC's claim of public interest standing fails, according to the Commission, because no statute authorizes ABC to bring this suit on behalf of nonunion contractors or their employees, and ABC has made no showing that nonunion

contractors or their employees ordinarily are unable to maintain such proceedings on their own behalf. (See *Bd. of Soc. Welfare* v. *County of L. A.* (1945) 27 Cal.2d 98, 100 [162 P.2d 627]; *Cornelius, supra*, at p. 1779.)

ABC responds that its standing stems from the injury visited on its members by being precluded from competing for airport contracts on an equal basis with union contractors. (See *Bras* v. *California Public Utilities Com'n* (9th Cir. 1995) 59 F.3d 869, 873 [to demonstrate standing, challenger of minority business enterprise quotas need only show it is forced to compete on an unequal basis].) As will appear, because the PSA excludes no qualified contractor from bidding, it does not deny ABC's members equal opportunity to seek airport contracts. If, however, ABC could demonstrate that the PSA specification has the effect of infringing its members' rights of association or expression, or that it has an anticompetitive impact on them, then ABC might legitimately claim a beneficial interest within the meaning of Code of Civil Procedure section 1086 and cases interpreting that statute. Thus, although ABC's allegations on the issue of standing are rather scanty, we conclude they suffice to confer standing to challenge the PSA on behalf of its members. (See *Adarand Constructors, Inc.* v. *Pena* (1995) 515 U.S. 200, 211 [115 S.Ct. 2097, 2104-2105, 132 L.Ed.2d 158].) (In a later part of this opinion addressing ABC's claim that the PSA violates certain provisions of the Labor Code, we discuss the Commission's contention that ABC lacks standing to assert the interests of its members' employees.)

*Whether state or local competitive bidding law applies*

As a charter city, San Francisco enjoys autonomous rule over municipal affairs pursuant to article XI, section 5 of the California Constitution, "subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law." (*Domar, supra*, 9 Cal.4th at p. 170; *Johnson* v. *Bradley* (1992) 4 Cal.4th 389, 397 [14 Cal.Rptr.2d 470, 841 P.2d 990]; *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 12 [283 Cal.Rptr. 569, 812 P.2d 916].) ABC argues the size and scope of the airport expansion renders the project a matter of statewide concern. It asserts that the airport is located outside the city limits of San Francisco, in San Mateo County, the project is funded with state and federal money and is subject to state prevailing wage laws, and the airport itself is projected to serve 51,000,000 passengers per year by 2006. These circumstances, ABC argues, necessarily remove the project from the category of purely municipal affairs. ABC contends, therefore, that the legality of the PSA specification in the airport expansion project bid must be determined with reference to Public Contract Code section 20128, rather than San Francisco Administrative Code section 6.1 (respectively the state and local competitive bidding laws).

The Commission disputes some of these assertions, noting that the airport is owned and operated by the City and County of San Francisco, that San Mateo County's (not the state's) prevailing wage rates apply only because the San Francisco Board of Supervisors selected those rates as the applicable measure (see S.F. Charter, appen. A, § A7.204; S.F. Admin. Code, §§ 6.38, 6.39; *Vial* v. *City of San Diego* (1981) 122 Cal.App.3d 346, 348 [175 Cal.Rptr. 647]), and that the project is funded through airport revenue bonds, not state or federal funds. Even apart from these factual disputes, the Commission contends ABC focuses on an inapt issue. The relevant inquiry, according to the Commission, is whether the *mode of contracting*, not the subject matter of the contract, is a "municipal affair." In support, the Commission relies on *Smith* v. *City of Riverside* (1973) 34 Cal.App.3d 529 [110 Cal.Rptr. 67], which reasoned: "Plaintiffs' contention that distribution of electricity and water are matters of statewide concern misses the mark. The municipal activity at issue is not the distribution of electricity and water but the mode chosen to build and extend the distribution facilities. '. . . Whatever the subject matter of a municipal contract, it is manifest that the mode in which a city chooses to contract is a municipal affair . . . .' (*Dynamic Ind. Co.* v. *City of Long Beach* [(1958)] 159 Cal.App.2d 294, 299 [323 P.2d 768].)" (*Smith* v. *City of Riverside, supra*, at p. 536; see also *Stacy & Witbeck, Inc.* v. *City and County of San Francisco* (1995) 36 Cal.App.4th 1074, 1081 [44 Cal.Rptr.2d 472] [San Francisco, as a charter city, has adopted its own laws requiring competitive bidding on public works contracts involving expenditure of more than $50,000]; *id.* at p. 1094, fn. 9 [competitive bidding requirements for general law cities are governed by the Local Agency Public Construction Act, Pub. Contract Code, § 20100 et seq.]; *Piledrivers' Local Union* v. *City of Santa Monica* (1984) 151 Cal.App.3d 509, 512 [198 Cal.Rptr. 731] [observing that state interest in the project is "not the same thing" as state interest in competitive bidding and concluding that state legislation demonstrating an interest in the operation of piers did not preempt local regulation of contract letting].)

The Commission's argument appears the better supported by authority, but we need not resolve the question, because the parties point to no substantive difference in the outcome of this case dependent on the application of state or local competitive bidding law. In resolving whether state or local law applies, the court must first determine whether a genuine conflict between those laws in fact exists. (*Johnson* v. *Bradley, supra*, 4 Cal.4th at pp. 400-401.) Only if the court concludes an actual conflict exists should it go on to analyze whether the state law addresses a matter of statewide concern. (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles, supra*, 54 Cal.3d at pp. 16-17.)

As the Court of Appeal in this case recognized and as all parties seem to agree, California Public Contract Code section 20128, requiring contracts be let to the "lowest responsible bidder," and San Francisco Administrative Code section 6.1, using the formulation "lowest reliable and responsible bidder," do not conflict. We therefore need not determine whether the inclusion of the PSA specification in the airport project bid request involves a matter of statewide concern.

*Whether the PSA is consistent with competitive bidding law*

Because the relevant language of the state and local competitive bidding laws, quoted in the immediately preceding paragraph, does not dispositively address the question before us, our analysis must focus on whether the PSA is consistent with the general principles underlying the competitive bidding law. As will appear, because the PSA requirement does not bar or substantially discriminate against a class of contractors, we conclude in the affirmative. Given that determination, in the next part of this opinion we address whether the record contains substantial evidence that the PSA furthers a legitimate governmental interest that is consistent with the competitive bidding law and thus supports the Commission's decision to require agreement to the PSA as a condition of contractors' participation in the project.

Recently, in *Domar, supra*, 9 Cal.4th 161, we enumerated the purposes of competitive bidding: " 'to guard against favoritism, improvidence, extravagance, fraud and corruption; to prevent the waste of public funds; and to obtain the best economic result for the public' [citations], and to stimulate advantageous market place competition [citation]." (*Id.* at p. 173.) We went on to observe: "As one leading treatise explains: 'The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest. These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purpose. Competitive bidding provisions must be read in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way.' (10 McQuillin, Municipal Corporations (3d rev. ed. 1990) § 29.29, p. 375, fns. omitted.)" (*Ibid.*)

■ The term "lowest responsible bidder" has been construed to mean " 'the lowest bidder whose offer best responds in quality, fitness, and capacity to the particular requirements of the proposed work.' " (*City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court* (1972) 7 Cal.3d 861, 867-868, fn. 5 [103 Cal.Rptr. 689, 500 P.2d 601], italics omitted, citing *West* v. *Oakland* (1916) 30 Cal.App. 556, 560 [159 P. 202] and holding that, despite use of the term "best," the lowest responsible bidder must be selected without consideration of relative superiority vis-à-vis other bidders.) Notably, this definition emphasizes the element of "responsiveness." A responsible bid thus is one that responds to all proper bid specifications, and, in setting such, the public agency must be accorded considerable latitude. (E.g., *Domar, supra*, 9 Cal.4th at p. 174.) By necessary implication, therefore, the direct cost of the project need not be the agency's sole consideration in setting bid specifications. Rather, any requirements reasonably relating to the "quality, fitness and capacity of a bidder to satisfactorily perform the proposed work" (*City of Inglewood-L.A. County Civic Center Auth.* v. *Superior Court, supra*, 7 Cal.3d at p. 867) generally are permissible.

■ Our first step is to consider the PSA in light of the purposes of the competitive bidding laws to determine whether it serves those purposes, or instead has the anticompetitive effect of excluding from the project, or denying equal opportunity to, any categories of potential bidders. (See *Domar, supra*, 9 Cal.4th at p. 173.)

ABC complains the imposition of the PSA is anticompetitive in that it "deters non-union contractors from bidding because it requires contractors to sign an agreement with the union and use <u>only</u> union supplied labor, pay into union benefit funds and adopt union wage rates."[2] (Underscoring in original.) ABC further argues the PSA violates the competitive bidding law because it contains various provisions that are unrelated to the quality, cost, or timeliness of the work and that, therefore, do not serve the purposes of the competitive bidding law. ABC's arguments fail to persuade us, because they lack support in the record and, at bottom, constitute an invitation to reweigh the considerations presented to the Commission.

■ "[C]ompetitive bidding requirements 'necessarily imply equal opportunities to all whose interests or inclinations may impel them to

---

[2]For the first time in this litigation, ABC also asserts that the PSA's exclusive hiring hall provisions, mandatory grievance procedure and designated employee benefit trust fund contribution requirements violate the sole source restriction contained in Public Contract Code section 3400. ABC's failure to plead this contention below precludes it from doing so here. Moreover, ABC fails to provide any analysis or argument in support of the assertion, which, for this additional reason, is not properly raised. (*People* v. *Barnett* (1998) 17 Cal.4th 1044, 1107, fn. 37 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

compete at the bidding.' [Citation.]" (*Domar, supra,* 9 Cal.4th at p. 173.)
 Here, all prospective bidders must agree to be bound by the terms of
the PSA, and the prevailing wage law further serves to place bidders on a
similar footing. Thus, all prospective bidders enjoy equal opportunity, within
the meaning of the competitive bidding law, to compete for contracts on the
project. That some of ABC's members may be disinclined to accept the
terms of the PSA does not imply any favoritism on the Commission's part
toward those bidders that do not share that disinclination.

As ABC expressly acknowledges, the PSA, by its terms, excludes no
contractor, union or nonunion, from bidding on the airport project. Further,
the PSA exacts from contractors no commitment toward the unions on any
other project, has no effect on a contractor's parent companies, subsidiaries
or affiliates, and does not apply to a contractor's managerial, supervisorial,
executive or clerical employees. ABC relies on *Neal Publishing Co.* v. *Rolph*
(1915) 169 Cal. 190, 196-198 [146 P. 659], in which we held that a
specification restricting bids for printing jobs to union shops was anticom-
petitive and unlawful. *Neal Publishing,* however, is distinguishable; here,
nonunion contractors are in no way excluded from bidding on the airport
project. Nothing in the *Neal Publishing* decision supports ABC's assertion
that the printer in that case could simply have "joined the union" for the
duration of the contract, as may a contractor, in order to qualify for work on
the airport project, choose to agree to the PSA. Indeed, the *Neal* decision
notes the union, for reasons not revealed, had revoked the printer's union
status. (*Id.* at p. 192.) ABC asserts there is not, and could never be, sufficient
record evidence to justify a public body's excluding every nonunion con-
struction contractor from working on a public works project. This assertion
has no relevance to the PSA at issue here.

Similarly unavailing is ABC's reliance on *Assoc. Gen. Contr. of Cal.* v.
*City & County of S.F.* (9th Cir. 1987) 813 F.2d 922, 925-927, in which the
federal Court of Appeals for the Ninth Circuit invalidated an ordinance
creating mandatory set-asides and bid preferences for women and minority
contractors, on the ground such accommodations lessened competition by
narrowing the range of acceptable bidders based solely on their membership
in a particular class. Here, by contrast, no bidder is disqualified for being a
"nonunion" contractor. Provided the contractor submits a responsive bid,
i.e., agrees to abide by the terms of the PSA, its bid stands on an equal
footing with all others.

As for the PSA's requirement that contractors engage new employees
through the union hiring hall, it must be recalled that the PSA permits a

contractor to use every member of its core work force, defined as persons on the contractor's active payroll for 60 of the preceding 100 days, in performing work under the project before requiring resort to the union hiring hall. Federal law, moreover, requires union hiring halls to refer both union members and nonmembers to available jobs. (*Woelke & Romero Framing, Inc.* v. *NLRB* (1982) 456 U.S. 645, 664-665 [102 S.Ct. 2071, 2082, 72 L.Ed.2d 398]; 29 U.S.C. § 158(a)(3), (b)(2).) In this respect, as well, the asserted anticompetitive effect of the PSA is difficult to discern. ABC suggests the PSA deters nonunion contractors from bidding on master plan contracts by intruding into the employer-employee relationship beyond the extent permitted or mandated by federal or state labor laws. It fails, however, to demonstrate that the PSA, which is a form of prehire agreement permitted under the NLRA, violates such laws. (See 29 U.S.C. § 158(e), (f).) The PSA, moreover, includes a management rights clause apparently designed to ensure that contractors on the project retain control over the manner in which the work is done.

As ABC acknowledges, the prevailing wage law, not the PSA, is the source of the applicable wage rates. (See S.F. Charter, appen. A, § A7.204 ["Every contract for any public work or improvement . . . must provide: [¶] . . . [¶] (b) that any person performing labor thereunder shall be paid not less than the highest general prevailing rate of wages in private employment for similar work; . . ."].) We have observed that prevailing wage laws are designed in part to permit union and nonunion contractors to compete on an even footing for public contracts. (*Lusardi Construction Co.* v. *Aubry* (1992) 1 Cal.4th 976, 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].) ABC fails to explain persuasively how the wage and benefit requirements in the PSA place ABC or its members at a competitive disadvantage. It suggests its workers prefer to receive the value of benefits directly, and thus to obtain a larger paycheck, rather than participate in union benefit plans; this circumstance, ABC urges, means it will be unable to attract its preferred workers. ABC fails entirely to establish, however, that union contractors will thereby enjoy an advantage over ABC in attracting these or any other available workers, or in the bidding process generally. The same reasoning compels rejection both of ABC's complaint that the PSA makes it more difficult to attract desired employees, because it forces nonunion workers to pay union dues, and of its assertion, raised for the first time in this court and supported by no citation to authority, that at the conclusion of the project ABC would be unfairly subjected to withdrawal liability pursuant to the Multiemployer Pension Plan Amendments Act of 1980 (29 U.S.C. § 1381 et seq.). Any such features of the PSA and of federal pension law would apply to all prospective bidders equally and result in the exclusion of none. Hence, the PSA is not anticompetitive merely because certain bidders would see some of its features as less attractive.

ABC suggests the PSA will raise the costs of the project because nonunion contractors would be able to use semiskilled or unskilled workers in place of some of the journeymen required to staff projects in union shops. No facts in the record support this suggestion, which appears to be potentially contrary to both state and federal law applicable to prevailing wage public works jobs. (See Lab. Code, § 1777.5 [only apprentices in approved apprenticeship programs who are paid at standard apprentice wage may be employed on public works]; cf. 29 C.F.R. § 5.5(a)(4)(i), (ii) (1998) [wage requirements for apprentices and trainees on federally funded public works projects].) Moreover, a bidder is not at liberty to lower its costs by substituting unskilled "helpers" for any skilled workers demanded by the contract specifications; ABC does not contend the contracting agency lacks discretion to specify standards for the performance of the work under contract.

As the Court of Appeal aptly observed, "If ABC chooses not to bid, that is its right, the exercise of which is strictly within its control." ABC members' election not to bid on the airport project, out of a desire to avoid dealing with unions or for whatever other reasons, does not make the PSA anticompetitive.

Judicial decisions in other jurisdictions are largely in accord with this conclusion, and those few that invalidate project labor agreements either do so under competitive bidding laws that, unlike those applicable to this case, emphasize "unfettered competition" over more generalized public interest considerations, or employ a less deferential standard of review of agency decisionmaking than obtains in this state.

In *Enertech Elec., Inc.* v. *Mahoning County Com'rs* (6th Cir. 1996) 85 F.3d 257, for example, the Ohio competitive bidding law, similar to that applicable in the present case, aimed " ' "to provide for open and honest competition in bidding for public contracts and to save the public harmless, as well as bidders themselves, from any kind of favoritism or fraud in its varied forms." ' [Citation.]" (*Id.* at p. 260.) The federal court of appeals concluded the county did not abuse its discretion by determining the "best" bidder would be one willing to ratify a project labor agreement designed to secure labor harmony on the project, such a requirement being consistent with the Ohio competitive bidding policy. Thus, although the contractor challenging the requirement was the lowest bidder, it was determined not to be the "best" bidder due to its refusal to agree to the project labor agreement. (*Ibid.*) An Ohio intermediate appellate court likewise upheld a project labor agreement in *State* ex rel. v. *Jefferson Cty. Bd.* (1995) 106 Ohio App.3d 176 [665 N.E.2d 723], reasoning the agreement did not conflict with the purpose of

the competitive bidding statutes, namely "to enable a public contracting authority to obtain the best work at the lowest possible price while guarding against favoritism and fraud." (*Id.* at p. 181 [665 N.E.2d at p. 727].)

Similarly, a federal court rejected a challenge to a project labor agreement under Minnesota's competitive bidding laws, which required contracts be awarded to the "lowest responsible bidder." (*Minn. Chapter of Assoc. Builders* v. *St. Louis Cty.* (D.Minn. 1993) 825 F.Supp. 238.) The court noted: "The county has an interest in avoiding delays resulting from labor difficulties, and the Project Labor Agreement is a rational way to address this interest. Furthermore, there is no evidence before the court that the project would cost less without the requirement that contractors sign the Project Labor Agreement. Contractors presumably would have to pay the prevailing wage with or without the labor agreement, so the cost to the state might not prove to be more as a result [of] the Project Labor Agreement. It might be that the avoidance of delays guaranteed by the Project Labor Agreement would ultimately save county money." (*Id.* at p. 244.) The same considerations supported the adoption of the PSA in this case.

The Alaska Supreme Court reached the same conclusion in rejecting a challenge to a project labor agreement under local procurement laws, which enunciated a policy of "maximum practicable competition." (*Laborers Local No. 942* v. *Lampkin* (Alaska 1998) 956 P.2d 422.) The court broadly interpreted "practicable" to encompass other factors besides cost, such as the need to complete the project (the renovation of a high school) with a minimum of disruption. (*Id.* at p. 434.)

In *N.Y. State Chapter* v. *Thruway Authority* (1996) 88 N.Y.2d 56 [643 N.Y.S.2d 480, 666 N.E.2d 185] (*Thruway*), the New York Court of Appeals considered competitive bidding law challenges to project labor agreements on two projects, one a four-year project to improve the Tappan Zee Bridge and the other a five-year project to modernize the facilities of a cancer institute. The New York high court observed that project labor agreements are neither absolutely prohibited nor absolutely permitted in public construction contracts under New York procurement law. Rather, such agreements are valid in New York "where the record supporting the determination to enter into such an agreement establishes that the PLA was justified by the interests underlying the competitive bidding laws." (*Id.* at p. 65 [666 N.E.2d at pp. 187-188].) The court concluded the project labor agreement for the bridge project did not violate competitive bidding laws because it was directly tied to competitive bidding goals: "The Thruway Authority's detailed focus on the public fisc—both cost savings and uninterrupted revenues—the demonstrated unique challenges posed by the size and complexity of the project, and the cited labor history collectively support the

determination that this PLA was adopted in conformity with the competitive bidding statutes." (*Id.* at p. 71 [666 N.E.2d at p. 191].)

In contrast, the court concluded the project labor agreement for the cancer institute project ran afoul of the principles underlying the competitive bidding laws because the responsible agency failed to show any "cost savings . . . or any unique feature of the project which necessitated a PLA." (*Thruway, supra,* 88 N.Y.2d at p. 74 [666 N.E.2d at p. 193].) Something more was required, according to the New York Court of Appeals, than a generalized desire for labor stability. (*Id.* at p. 74 [666 N.E.2d at pp. 193-194].)

·In the *Thruway* case, the New York Court of Appeals evidently employed a standard of review that placed the burden on the agency to demonstrate the appropriateness of the project labor agreement as a bid specification, rather than (as under our law) on the party challenging the specification to show the agency acted arbitrarily and capriciously in adopting the requirement. (Compare 88 N.Y.2d at p. 69 [666 N.E.2d at p. 190] [the agency operating under a competitive bidding law "bears the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statutes"] with *WSPA, supra,* 9 Cal.4th at p. 574.) The *Thruway* decision, therefore, must be read with this significant distinction in mind.

The only other cases ABC cites in which courts have held a project labor agreement to violate competitive bidding laws arise under New Jersey law. In *George Harms Const.* v. *Turnpike Auth.* (1994) 137 N.J. 8 [644 A.2d 76] (*George Harms*), the New Jersey high court acknowledged that project labor agreements serve important purposes on major long-term construction projects, including preventing the expiration of collective bargaining agreements of different crafts during the term of the construction contract or resolving disputes among the several crafts, and for this reason have been used on such projects as the Cleveland sports complex in northern Ohio, Minneapolis's Glenwood Bridge, the Massachusetts Central Artery/Third Harbor Tunnel, and the Boston Harbor sewage treatment facility construction. Nevertheless, the court concluded the project labor agreement at issue in that case was inconsistent with New Jersey's "paramount policy" of fostering "unfettered competition" in public contracts, a policy it could not reconcile with what it viewed as the agreement's "sole-source" restriction on labor. (*Id.* at p. 44 [644 A.2d at p. 95].) The latter restriction allegedly precluded the contractor from using its own employees, who belonged to a union not affiliated with the local Building and Construction Trades Council

of the AFL-CIO, a party to the project labor agreement along with the turnpike authority. Moreover, in *George Harms* the project labor agreement requirement was added *after* the bids were submitted and resulted in invalidation of the admittedly lowest bidders, who refused to agree to this new term. The belated addition of a material specification raised the specter of favoritism and corruption, which are among the ills against which the competitive bidding laws seek to guard. (*Id.* at pp. 15, 36-38 [644 A.2d at pp. 79-80, 90-91].) Such a danger does not exist in the present case.

Subsequently, however, in *Tormee Const.* v. *Mercer County Imp.* (1995) 143 N.J. 143 [669 A.2d 1369] (*Tormee*), the New Jersey Supreme Court made clear that project labor agreements are not per se illegal under the laws of that state, although it appeared to conclude such agreements may be required only in exceptional circumstances. (*Id.* at pp. 149-151 [669 A.2d at pp. 1372-1373].) The court noted that New Jersey Governor Christine Todd Whitman had signed an executive order contemplating that state agencies might include a project labor agreement in a public works project on a " 'project by project basis where it has been determined that such project agreement will promote labor stability and advance the state's interest in cost, efficiency, quality, safety and/or timeliness.' " (*Id.* at p. 150 [669 A.2d at p. 1372].) Without specifying the textual basis for its interpretation, a majority of the New Jersey high court nevertheless read the executive order as "not contemplat[ing] the use of PLAs on routine construction projects," of which the Mercer County project was, it determined, one. (*Ibid.*) The majority appeared to conclude that only "exceptional circumstances" would warrant adoption of a project labor agreement. (*Id.* at p. 149 [669 A.2d at p. 1372].)[3]

ABC directs us to no authority supporting the existence of a policy of "unfettered competition" underlying the competitive bidding law of California. While Public Contract Code section 10115 (located in an article creating minority and women participation goals for state contracts) extols the value of free competition in the American economic system, that statute does not alter the policies underlying the competitive bidding laws, as set forth in *Domar, supra,* 9 Cal.4th at page 173, and reiterated above. Indeed, as mentioned, the competitive bidding laws are " 'enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such

---

[3]We observe that the *Tormee* court suggested a project labor agreement might be valid if it possessed some of the features shared by the PSA in the present case, such as the absence of a requirement that the successful bidder be a union contractor and allowing a contractor to retain a core of its work force. (*Tormee, supra,* 143 N.J. at pp. 149-150 [669 A.2d at p. 1372].)

purpose fairly and reasonably with sole reference to the public interest.' " (*Ibid.*) Moreover, it appears the New Jersey Supreme Court employs a standard of review of administrative agency quasi-legislative decision-making that is much less deferential than that prevailing in this state. (See *Tormee, supra,* 143 N.J. at p. 160 [669 A.2d at p. 1377] (dis. opn. of Handler, J.) ["The majority also betrays, in this case, a distrust of local government that goes beyond the obligation to demonstrate that a PLA is reasonably related to the satisfactory completion of the library project."].) In light of these considerations, we find the New Jersey decisions unpersuasive.

More recently, the Supreme Court of Nevada upheld the validity, under state competitive bidding laws, of the imposition of a project labor agreement in connection with the Southern Nevada Water Authority's capital improvement plan. (*Associated Bldrs.* v. *So. Nev. Water Auth.* (Nev. 1999) 979 P.2d 224.) The Nevada high court determined the agreement at issue in that case served the purposes of the state's competitive bidding laws by providing equal access to projects to both union and nonunion contractors and indirectly saving public funds by protecting the project from costly delays due to labor unrest. (*Id.* at p. 229.) ABC observes that the language of the Nevada competitive bidding statute differs from that of both the San Francisco ordinance and the state competitive bidding laws, but we note that the Nevada Supreme Court identifies as the purposes underlying the Nevada statute the same ones we, interpreting California law, identified in *Domar*: to secure competition, save public funds, and guard against favoritism, improvidence and corruption. (See *Domar, supra,* 9 Cal.4th at p. 173; cf. *Associated Bldrs.* v. *So. Nev. Water Auth., supra,* 979 P.2d at p. 229.) We therefore conclude the Nevada high court's decision is relevant and persuasive.

ABC complains that, contrary to the argument of the Trades Council, a contractor may not necessarily be able to comply with the PSA requirement if that contractor's employees have previously rejected the pertinent union in an election, or if the contractor either has signed a collective bargaining agreement or is in negotiation with a different labor organization, as in *George Harms, supra,* 137 N.J. 8 [644 A.2d 76]. The contractor's compliance with the PSA in such circumstances, ABC contends, would constitute an unfair labor practice, because it would interfere with its workers' right to choose their bargaining representative pursuant to section 7 of the NLRA (29 U.S.C. § 157). The merits of ABC's contention are difficult to assess, as it cites no authority on point or clearly mandating such a conclusion. Nothing in the record, moreover, suggests such a scenario potentially exists in this case, and ABC cites no example of such a problem among its membership,

much less represents it may have played a role in any contractor's decision not to bid on the project. No reason appears why any such concern, if it existed, could not have been brought to the Commission's attention before the adoption of the PSA bid specification, as the identity of the signatory unions was no secret during the public hearings leading thereto. Neither ABC nor any other interested person, however, did so. ABC therefore fails to demonstrate the Commission invalidly imposed the PSA bid requirement on this basis.

*Whether substantial evidence supports the Commission's adoption of the PSA bid specification*

The familiar principles constraining our review are easily reiterated: In determining whether the Commission's decision to adopt the PSA bid specification was supported by substantial evidence, we resolve all conflicts in favor of the prevailing party, indulging in all legitimate and reasonable inferences from the record. When a finding is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence in the record, contradicted or uncontradicted, that will support the finding. When two or more inferences can be reasonably deduced from those facts, the reviewing court has no power to substitute its deductions for those of the fact finder. (*WSPA, supra*, 9 Cal.4th at p. 571.) On review of administrative agency findings, extra-record evidence cannot be admitted merely to contradict the evidence on which the agency relied in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision. (*Id.* at p. 579.)

We conclude substantial evidence supports the Commission's adoption of the PSA bid specification as being in furtherance of legitimate governmental interests. Consistent with the competitive bidding laws, these interests include preventing costly delays and assuring contractors access to skilled craft workers. The record reflects that the Commission was concerned about the potential for labor strife during the life of the project. Before voting on the resolution adopting the PSA, the Commission held two public meetings to hear evidence and argument on the desirability of the agreement.[4] As the Court of Appeal observed: "Seventy-seven separate construction contracts were interrelated by time and effect. John L. Martin,

---

[4]As the Commission observes, however, the fact that two public meetings were held, resulting in fact-finding, does not alter the quasi-legislative character of the Commission's adoption of the PSA. (See *20th Century Ins. Co.* v. *Garamendi, supra*, 8 Cal.4th at p. 279.)

By request filed on April 20, 1998, the Commission asks this court to take judicial notice of the transcripts of the two public hearings it conducted before adopting the PSA bid specification. In support of the request, the Commission relies on Evidence Code sections

director of airports, whose declaration was submitted by the Commission in opposition to ABC's petition below, stated that for every month of delay in completion of the master plan, it was estimated that the cost of administering the project would increase by $1.5 million, and the Commission would lose revenue of $13 million. Inflation alone would add an additional $4,635,000 monthly to the cost of the master plan. In addition, there would be increased expenditures needed for the continuation of temporary facilities, and an unquantifiable loss of tourist revenue to San Francisco. Director Martin noted that significant delays in the completion of one contract would likely have a 'domino effect' by causing delays in the completion of other, later-in-time contracts." On the other hand, the Commission had before it no evidence that the cost of prosecuting the work contemplated by the master plan would increase as a result of the PSA compliance requirement. The PSA includes provisions designed to prevent strikes, slowdowns and other work stoppages, and to ensure contractors a steady and reliable source of skilled labor for the project. In view of the evidence before the Commission demonstrating the substantial costs associated with preventable delays, we cannot say that the adoption of the PSA requirement was arbitrary, capricious, or lacking in evidentiary support. The Commission could properly find that these provisions serve the goals of the competitive bidding laws, in particular to " 'secure the best work or supplies at the lowest price practicable . . . for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders.' " (*Domar, supra,* 9 Cal.4th at p. 173.)

ABC argues the Commission could not properly act on such concerns absent evidence of labor unrest on prior projects at the airport or without considering narrower solutions, such as requiring only *union* contractors to agree to no-strike clauses. ABC does not persuade us the Commission's discretion was so constrained. We rejected an analogous argument in *Domar, supra,* 9 Cal.4th at page 174, that a minority/women outreach program imposed as a bid requirement had to be shown actually to promote competition or reduce prices. "Despite the lack of empirical evidence," we said, "it is not unreasonable for the Board to conclude that, in the absence of mandated outreach, prime contractors will tend to seek out familiar subcontractors when bidding for projects, and that therefore their bids may or may not reflect as low a price had reasonable outreach efforts been made. Indeed, Domar is unable to cite to anything in the record that might detract from

---

452, subdivision (c), and 459, subdivision (a), which permit courts to take judicial notice of "[o]fficial acts of the . . . executive . . . departments of . . . any state of the United States," and which have been read to allow judicial notice of administrative agency records. (See *Fowler* v. *Howell* (1996) 42 Cal.App.4th 1746, 1749-1750 [50 Cal.Rptr.2d 484]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1998) ¶¶ 5:155, 5:155.1, p. 5-38.) We grant the request.

such a conclusion. Under these circumstances, the Board's action is entitled to deference." (*Ibid.*) Similarly here, the Commission was not required to seek evidence of past labor strife at the airport, or await future labor unrest, before bargaining for a no-strike agreement designed to avoid costly delays in the completion of the project.

ABC, moreover, cannot exclude the possibility that *nonunion* workers might engage in a strike, slowdown or other job action; it merely argues such action by nonunion workers is unlikely. The Commission was not, however, required to rely on the asserted unlikelihood of such action and thus to exempt nonunion workers from the no-strike pledge.

ABC asserts that unspecified federal and state labor laws already exist to deal with the possibility of labor unrest. Hence, it urges, adoption of the PSA was unwarranted.[5] As the Trades Council correctly argues, however, labor unrest is not illegal in this country. Only through some form of collective bargaining agreement can the Commission and the employers on the project eliminate workers' right to strike. (See *Boys Markets* v. *Clerks Union* (1970) 398 U.S. 235, 247-254 [90 S.Ct. 1583, 1591-1594, 26 L.Ed.2d 199] [court may enjoin concerted activities by unionized employees who are covered by a labor contract that contains a mandatory grievance adjustment procedure]; *Labor Bd.* v. *Washington Aluminum Co.* (1962) 370 U.S. 9, 14-18 [82 S.Ct. 1099, 1102-1104, 8 L.Ed.2d 298] [NLRA protects nonunionized employees who engage in concerted activities, including work stoppages].) The Commission could reasonably conclude the PSA offered the most effective way to ensure labor harmony on the project and thereby avoid the undesirable consequences of work disruption.

Having concluded ABC has failed to demonstrate that the PSA in the present case conflicts with competitive bidding laws, we observe that future challenges to the imposition of project labor agreements as bid requirements will be reviewed, on a case-by-case basis, for consistency with the competitive bidding laws under the principles articulated in this opinion.[6]

---

[5]ABC also asserts that "the evidence overwhelming[ly] proves that PSAs raise project costs and reduce the number of bidders." ABC proceeds to cite certain materials, never presented to the Commission, that purportedly support its assertion. In response, the Trades Council requests that we exercise our authority under rule 18 of the California Rules of Court to strike from ABC's brief all references to matters not found in the record. We do not consider these factual assertions, along with numerous others in ABC's brief, that find no basis in the record. (See *WSPA, supra,* 9 Cal.4th at p. 574.)

[6]The Commission has moved this court to strike or disregard ABC's supplemental brief, contending the declarations comprising part of the brief set forth irrelevant hearsay and violate rule 13 of the California Rules of Court and principles articulated in *WSPA, supra,* 9

*Whether the PSA violates Labor Code section 923, 1779, or 1780*

 Labor Code section 923 declares that the public policy of California favors the rights of individual workers to freedom of association, self-organization, the designation of representatives of their choice, negotiation of the terms and conditions of their employment, and freedom from interference or restraint by employers in the exercise of those rights.[7] ABC contends the PSA frustrates the right of its members' workers under this statute by precluding them from choosing for themselves whether to be represented by the relevant craft union.

There are several problems with ABC's argument. First, as the Commission and the Trades Council point out, ABC lacks standing to assert the organizational rights of the workers employed by its members. None of the cases ABC cites in an attempt to demonstrate it possesses standing to do so are relevant,[8] and other courts addressing the issue in the context of project

Cal.4th at page 574, by referring to factual matters outside the record. ABC contends its brief is proper under rule 29.3 of the California Rules of Court, which provides that "[w]hen a party desires to present new authorities, newly enacted legislation, or other intervening matters, not available in time to have been included in the party's brief on the merits, the party may serve and file a supplemental brief" within specified time limits. (Cal. Rules of Court, rule 29.3(a).) Rule 29.3, however, addresses the timing of appellate supplemental briefing, but does not purport to specify what matters a court may properly consider in deciding a case. The latter is a question that must be answered by reference to generally applicable legal principles. We agree with the Commission's characterization of the declarations as improper, and therefore disregard them. We have considered the two judicial decisions comprising the remainder of ABC's supplemental brief, as we would any other cited cases, and conclude neither of them constitutes authority for invalidating the PSA requirement.

ABC's requests for judicial notice of certain newspaper articles and excerpts from a report of a consultant to the Metropolitan Water District of Southern California are denied.

[7]"Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (Lab. Code, § 923.)

[8]ABC cites *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 465, footnote 3 [156 Cal.Rptr. 14, 595 P.2d 592], in which this court concluded an association had standing to challenge discriminatory hiring policies of a quasi-public entity. Clearly, however, in *Gay Law Students* there was no potential divergence of interests between the association and its members. Here, in contrast, the potential for economic and other conflicts between

labor agreements have uniformly rejected attempts by contractor associations to assert standing on behalf of their members' employees. (See, e.g., *Assoc. Gen. Contractors* v. *Otter Tail Power* (8th Cir. 1979) 611 F.2d 684, 693 ["The assertion of the employees' rights is properly left to a plaintiff who actually has those rights."]; Utility Contractors Ass'n of New England v. Comm. of Mass. Dept. of Public Works (Mass. Super.Ct. 1996) 5 Mass.L.Rptr. 17, 33 [1996 WL 106983, *12] [holding contractors' association lacked standing because it was not an affected employee or association of employees but rather an association of contractors, and neither it nor any of its members had suffered a cognizable injury under statute protecting workers]; *NYS Chapter* v. *NY State Thruway Authority* (1994) 207 A.D.2d 26 [620 N.Y.S.2d 855], affd. 88 N.Y.2d 56 [666 N.E.2d 185] [concluding contractor-bidders lacked standing to assert violations of constitutional and statutory provisions on behalf of employees]; cf. *Azusa Western, Inc.* v. *City of West Covina* (1975) 45 Cal.App.3d 259, 265-266 [119 Cal.Rptr. 434] [" 'It is a firmly established principle of law that one may not urge the unconstitutionality of a statute unless his rights are adversely affected thereby . . . .' [Citation.]"].)

Second, ABC's argument lacks merit under state law. The California statutes that declare and protect workers' rights to self-determination in matters of labor organization cannot reasonably be construed to invalidate project labor agreements. Courts have held that even agency shop agreements are lawful in this state; a fortiori, project labor agreements, which restrict workers' freedom to a lesser degree, must also be lawful. (*Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 474-475 [2 Cal.Rptr. 470, 349 P.2d 76] ["[C]losed or union shop agreements and concerted activities to achieve them are lawful in this state whether or not a majority of the employees directly involved wish such agreements."]; *Rae* v. *Bay Area Rapid Transit Supervisory etc. Assn.* (1980) 114 Cal.App.3d 147, 154 [170 Cal.Rptr. 448] ["The right to work guaranteed by the California Constitution is not absolute, but may be limited by an agreement that union membership is a condition for employment."]; see also *Boston Harbor, supra,* 507 U.S. at p. 230 [113 S.Ct. at pp. 1197-1198] [federal law permits construction industry employers to enter into agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of hiring halls before hiring any employees];

---

ABC, or its members, and their employees is obvious. ABC also cites *Bras* v. *California Public Utilities Com'n, supra,* 59 F.3d 869, but fails to explain how that case is relevant in this context. In *Bras,* the federal court of appeals held that an architectural firm had standing to seek injunctive relief against a governmental agency's affirmative action program. (*Id.* at pp. 873-875.)

*Lehnert* v. *Ferris Faculty Assn.* (1991) 500 U.S. 507, 520-521 [111 S.Ct. 1950, 1960, 114 L.Ed.2d 572] [union security agreements are justified by the government's interest in promoting labor peace and avoiding the "free rider" problem that would otherwise accompany union recognition].) *Englund* v. *Chavez* (1972) 8 Cal.3d 572, 593 [105 Cal.Rptr. 521, 504 P.2d 457], on which ABC relies, has no application here: That case dealt with agricultural workers, who are expressly not governed by the NLRA (see 29 U.S.C. § 152(3)), and, indeed, California law bars prehire agreements in the agricultural industry (see Lab. Code, §§ 1153, subd. (f), 1156-1159).

Finally, ABC's argument fails to come to terms with the supremacy of federal labor law, embodied in 29 United States Code section 158(f), which permits prehire agreements in the construction industry. Any California law purporting to bar such agreements would raise serious questions of preemption under *Machinists* v. *Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132, 147 [96 S.Ct. 2548, 2556, 49 L.Ed.2d 396], which prohibits state and municipal regulation of areas that have been left " 'to be controlled by the free play of economic forces.' " (*Id.* at p. 140 [96 S.Ct. at p. 2553].) "*Machinists* pre-emption preserves Congress' 'intentional balance " 'between the uncontrolled power of management and labor to further their respective interests.' " ' [Citation.]" (*Boston Harbor, supra*, 507 U.S. at p. 226 [113 S.Ct. at p. 1195].) As the high court observed, "Indeed, there is some force to petitioners' argument . . . that denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists*." (*Id.* at p. 232 [113 S.Ct. at p. 1198].) It is unnecessary here to resolve definitively whether the rule in *Machinists* would preempt the interpretation of Labor Code section 923 for which ABC argues, as we conclude that interpretation does not correctly reflect California law.

ABC forfeited its contentions regarding Labor Code sections 1779 and 1780 by failing to raise them at a prior stage of this litigation, and we therefore need not address them. (Cal. Rules of Court, rule 29(b)(1).) Were we to do so, how they would provide a basis for invalidating the PSA requirement is in any event unclear. These statutes are criminal anti-kickback laws;[9] ABC cites no authority supporting its implicit argument that they create a private right of action against a public entity for imposition of

---

[9]Labor Code section 1779 provides: "Any person or agent or officer thereof who charges, collects, or attempts to charge or collect, directly or indirectly, a fee or valuable consideration for registering any person for public work, or for giving information as to where such employment may be procured, or for placing, assisting in placing, or attempting to place, any person in public work, whether the person is to work directly for the State, or any political

a bid requirement. Moreover, nothing in the record supports ABC's accusation that union hiring halls charge fees for usage. The discriminatory charging of such fees, we note, may be an unfair labor practice under federal law. (See 29 U.S.C. § 158(b)(5); *Local 138, Internat'l U. of Operating Engineers v. N.L.R.B.* (2d Cir. 1963) 321 F.2d 130, 134; *N.L.R.B. v. Local 138, Internat'l U. of Operating Engineers* (2d Cir. 1967) 385 F.2d 874, 877-878.) Finally, the same question of possible *Machinists* preemption, noted above, would arise were sections 1779 and 1780 interpreted to preclude project labor agreements of the kind involved in this case.

*Whether the PSA requirement infringes ABC's constitutional rights of association and equal protection*

 Relying chiefly on *O'Hare Truck Service, Inc. v. City of Northlake* (1996) 518 U.S. 712 [116 S.Ct. 2353, 135 L.Ed.2d 874] (*O'Hare*), ABC contends the imposition of the PSA as a bid specification violates its First Amendment rights to free association and free expression, because it compels contractors to abandon their "merit shop philosophy" and embrace union agreements in order to obtain work on the airport project. *O'Hare*, however, does not support the contention. In that case, the United States Supreme Court held a city may not, consistently with the First Amendment, retaliate against an independent contractor by terminating his contract because of his refusal to contribute to the mayor's reelection campaign and his support for the mayor's opponent. (*Id.* at pp. 715, 721 [116 S.Ct. at pp. 2355-2356, 2358-2359].) Here, the PSA requirement in no way prevents ABC or its members from freely expressing their "merit shop philosophy" and opposition to unions, nor does it coerce "pro-union" expressions or associations. Nothing in the PSA stops ABC or its members from, or punishes them for, engaging in whatever political action or advocacy they wish. Although ABC members' election not to bid on the project might result in some loss of revenues to them, the First Amendment does not oblige the government to minimize the financial repercussions of such a choice. (*Lyng v. Automobile Workers* (1988) 485 U.S. 360, 368 [108 S.Ct. 1184, 1190-1191, 99 L.Ed.2d 380] [statute barring grant or increase of food

---

subdivision or for a contractor or subcontractor doing public work is guilty of a misdemeanor."

Labor Code section 1780 provides: "Any person acting on behalf of the State or any political subdivision, or any contractor or subcontractor or agent or representative thereof, doing any public work who places any order for the employment of a workman on public work where the filling of the order for employment involves the charging of a fee, or the receiving of a valuable consideration from any applicant for employment is guilty of a misdemeanor."

stamps for loss of earnings resulting from strike does not infringe on workers' associational rights].)

Even if we could conclude the PSA somehow burdens ABC's political views, we observe that the high court in *O'Hare* recognized: "Cities and other governmental entities make a wide range of decisions in the course of contracting for goods and services. The Constitution accords government officials a large measure of freedom as they exercise the discretion inherent in making these decisions. [Citation.] Interests of economy may lead a governmental entity to retain existing contractors or terminate them in favor of new ones without the costs and complexities of competitive bidding. A government official might offer a satisfactory justification, unrelated to the suppression of speech or associational rights, for either course of action. The first may allow the government to maintain stability, reward good performance, deal with known and reliable persons, or ensure the uninterrupted supply of goods or services; the second may help to stimulate competition, encourage experimentation with new contractors, or avoid the appearance of favoritism. These are choices and policy considerations that ought to remain open to government officials when deciding to contract with some firms and not others, provided of course the asserted justifications are not the pretext for some improper practice." (*O'Hare, supra,* 518 U.S. at pp. 724-725 [116 S.Ct. at p. 2360].)

As discussed above, the Commission could reasonably determine the PSA would further the aims of the competitive bidding law and the public interest. To whatever extent the PSA specification might be seen to burden ABC's political expression, the Commission, in the words of the *O'Hare* court, could properly conclude the specification is " 'an appropriate requirement for the effective performance' of the task in question." (*O'Hare, supra,* 518 U.S. at p. 725 [116 S.Ct. at p. 2361].) Moreover, as the Trades Council observes, employers do not have a constitutional right to operate "nonunion" shops or "associate" only with unorganized employees. Federal labor law gives employees the right to organize and requires their employer to bargain collectively. (See 29 U.S.C. § 158(a)(5); see also Lab. Code, § 923.)

In passing, ABC asserts the PSA violates state and federal constitutional guarantees of equal protection (U.S. Const., Amend. XIV; Cal. Const., art. I, § 7 and art. IV, § 16) in discriminating against contractors and their employees based on their political beliefs. ABC abandoned these contentions by failing to raise them in its arguments before the Court of Appeal. (Cal. Rules of Court, rule 29(b)(1).) In any event, as noted, the PSA excludes no

contractor or employee; any contractor, whether union or nonunion, is free to bid on the project. Consequently, ABC fails to establish that its members or their employees are denied equal protection under either the state or the federal charter. (See *Associated Builders & Contractors* v. *Contra Costa Water Dist.* (1995) 37 Cal.App.4th 466, 471 [43 Cal.Rptr.2d 600].)

## CONCLUSION

The judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.