Filed 4/28/25  Chaldean Coalition v. County of San Diego Independent Redistricting etc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHALDEAN COALITION, INC., Plaintiff and Appellant, v. THE COUNTY OF SAN DIEGO INDEPENDENT REDISTRICTING COMMISSION, et al., Defendants and Respondents. | D082834, D084330 (Super. Ct. No. 37-2022-00008447-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna, Mark D. Myers and Jeffrey M. Trissell for Plaintiff ad Appellant.

Colantuono, Highsmith & Whatley, Holly O. Whatley and Vernetra L. Gavin for Defendant and Respondent County of San Diego Independent Redistricting Commission.

Claudia G. Silva, County Counsel, and Timothy M. White, Deputy County Counsel, for Defendants and Respondents County of San Diego and Registrar Cynthia Paes.

INTRODUCTION

This appeal arises from the trial court's denial of a petition for traditional writ of mandate. The petition was brought by nonprofit Chaldean Coalition, Inc. (Coalition) to challenge certain decisions made by the officials responsible for the most recent redrawing of San Diego County's five supervisorial districts.

The Coalition's claims centered on a decision that resulted in members of the Chaldean community being placed in different supervisorial districts. The Coalition asserted the redistricting decision was racially motivated such that it violated relevant law and was unconstitutional as well as arbitrary and capricious.

After a bench trial, the trial court issued a statement of decision finding the Coalition lacked standing and also failed to prove its claims. The Coalition appeals the judgment entered on the statement of decision. We conclude the Coalition established public interest standing to bring its petition, but we affirm the judgment because the Coalition fails to establish an error that is prejudicial.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The 2020 Supervisorial Redistricting of San Diego County*

A. *Decennial Redistricting Generally*

At the start of each decade, once the federal government completes its national census, the census data is delivered to states and local jurisdictions and the process of redistricting begins. (*Legislature of State of California v. Padilla* (2020) 9 Cal.5th 867, 871 (*Padilla*).) The goal of redistricting is to create new district maps that reflect the new population data, thereby ensuring equal representation of the districts. (*Ibid.*)

2

San Diego County, which is divided into five supervisorial districts (San Diego County Charter, § 400), is among the localities that conduct decennial redistricting. This redistricting task has been legislatively committed to an independent redistricting commission (IRC). (Elec. Code, § 21550, subd. (b)(1).) The IRC is an independent panel of 14 county residents of different political party affiliations. (Elec. Code, § 21550, subds. (b)(1), (c).)

The standards governing the redrawing of San Diego County's supervisorial districts are set forth in Elections Code section 21552, which requires the IRC to draw the districts by using the following criteria "in the following order of priority": The districts must (1) comply with the United States Constitution and have reasonably equal populations; (2) comply with the federal Voting Rights Act of 1965 (VRA) (52 U.S.C. § 10101, et seq.); (3) be geographically contiguous; (4) preserve, to the extent possible given other requirements, the geographical integrity of any city, local neighborhood, or local community of interest; and (5) be drawn to encourage geographical compactness. (Elec. Code, § 21552, subd. (a)(1)–(5); see *id.*, subd. (a)(4) ["A community of interest is a contiguous population that shares common social and economic interests that should be included within a single district for purposes of its effective and fair representation. Communities of interest shall not include relationships with political parties, incumbents, or political candidates."].) The statute also specifies that districts must *not* be drawn for the purpose of favoring or discriminating against an incumbent, political candidate, or political party. (*Id.*, subd. (b).) In addition, under the San Diego County Charter, the IRC must ensure that at least three districts include unincorporated territory, with two districts being primarily unincorporated if population permits. (San Diego County Charter, § 400.1.)

3

And finally, the IRC must hold open meetings. (See Elec. Code, § 21552, subd. (c)(1) [stating the IRC "shall comply with the Ralph M. Brown Act [(Gov. Code, § 54950, et seq.)]," which generally requires local legislative bodies to hold open meetings].)

The IRC that conducted the most recent supervisorial redistricting of San Diego County was formed in the fall of 2020. In 2021, the IRC retained the services of expert consultants, including expert demographer FLO Analytics, which provided mapping, data, demographics, and statistics services.

B.  *The IRC's 2020–2021 Redistricting*

On September 20, 2021, data from the 2020 census was delivered to local jurisdictions for use in redistricting.[1]  Shortly thereafter, the IRC began its mapping process. In early October, FLO Analytics independently created four springboard maps, or springboard "scenarios," designed to facilitate the development of draft maps. FLO Analytics also published a webpage that directed the public to online tools for submitting proposed maps. FLO Analytics presented its four springboard scenarios at an October 7, 2021 IRC meeting.

Over the next two months, between October 14 and December 14, 2021, the IRC engaged in an iterative mapping process that culminated in a final

---

[1]    Ordinarily, the IRC would have been required to adopt its redistricting map by August 2021. However, due to the COVID-19 pandemic, the release of census data was delayed by four months, which prompted the Legislature to seek and obtain permission to extend the redistricting deadline. (See Elec. Code, § 21552, as amended by Stats. 2020, ch. 90, §§ 3, 8; *Padilla*, *supra*, 9 Cal.5th at pp. 874–875.) As a result, the deadline was extended to December 15, 2021.

4

redistricting plan.[2]  It started the process by instructing FLO Analytics to prepare four draft maps.  Each draft configured the five supervisorial districts differently, although draft maps 2, 3, and 4 were similar in that they all put the city of El Cajon as well as Rancho San Diego (a census-designated place southeast of El Cajon) in a central district that included territory stretching to the west along the south side of the I-8 freeway, with either the I-805 or I-5 freeways serving as the district's western boundary.[3]  (See Appendix, Figures 2a–2d.)

In October 2021, the IRC also began to receive draft maps from the public.  One public draft map was submitted by a nonprofit called the Partnership for the Advancement of New Americans (PANA), which represents the interests of refugees and immigrants from "Arab, Middle Eastern, Muslim, South Asian, and Black" communities.  This draft map created a proposed boundary for a central district not unlike the central districts in the majority of the IRC's draft maps in that it encompassed Rancho San Diego and El Cajon as well as territory stretching to the west along the south side of the I-8 freeway, terminating at the I-5 freeway.  (See Appendix, Figure 3.)  On October 21, the IRC moved to modify two of its drafts (draft maps 2 and 3) to include the "PANA proposal."

Revised versions of draft map 2 and draft map 3 were then advanced forward and revised again—three more times in total between October 21 and November 19, 2021.  (See Appendix, Figure 1.)  On November 19, the

---

[2]    The appendix to this opinion, at Figure 1, shows a graphic representation of this iterative mapping process.

[3]    We refer to a central district rather than a specific district number because the number assigned to it changed over the course of the mapping process.

5

IRC had FLO Analytics revise a draft map that was a descendant of draft map 3 (draft map 13a) into five different versions. In early December, the IRC considered two additional versions of draft map 13a (which were labeled nonsequentially as versions 10 and 11). (Appendix, Figure 1.) The IRC adopted the last version, version 11, as its final working draft map on December 3. The final working draft map included a central district (now numbered District 4) that was bounded on the west by the I-5 freeway and on the north by the I-52 freeway; stretched west to east by incorporating territory south of the I-8 freeway; and at its easternmost end encompassed El Cajon, but not Rancho San Diego (which was made part of an expansive eastern, or "East County," district that was numbered District 2). (See Appendix, Figure 4.)

Members of the public commented on virtually every aspect of the IRC's redistricting. Some, including members of the Chaldean community, objected to El Cajon being included in a central district rather than an East County district. Others supported combining the central district community of City Heights with communities to the east such as La Mesa, El Cajon, Paradise Hills, Spring Valley, and Rancho San Diego.

On December 9, 2021, the IRC held a meeting during which it considered four possible modifications to the final working draft map (scenarios 1, 2, 3a, and 3b). In the first scenario, El Cajon and Rancho San Diego were within District 4 (hereafter, the central district); in the second scenario, both areas were within District 2 (hereafter, the East County district); in the third and fourth scenarios (3a and 3b) (collectively, scenario 3), El Cajon was within the East County district and Rancho San Diego was within the central district.

During the December 9, 2021 meeting, the IRC received public objections to including El Cajon in the central rather than the East County district, including from persons who identified themselves as members of the Chaldean community. Members of the Chaldean community also opposed splitting Chaldeans living in El Cajon from those living in Rancho San Diego. Another member of the public favored keeping Rancho San Diego and El Cajon together with "areas like City Heights" and mentioned "the needs of newcomer communities" as a reason for this preference. The IRC also received public comments expressing the view that removing Rancho San Diego and other nearby areas from the central district would fracture a "Black community of interest."

On December 11, 2021, the IRC debated the scenarios and voted to move forward with scenario 3b. (Again, scenario 3b placed El Cajon within the East County district and Rancho San Diego within the central district.) On December 14, the IRC adopted the scenario as its final redistricting plan. (See Appendix, Figures 1, 5.)

According to the 2020 census, the total population of San Diego County was 3,302,262. Dividing this number equally among the five supervisorial districts would result in each district having exactly 660,452 people. The final 2021 redistricting plan fell short of this ideal, as follows:

| District ID | Total Population | Over / Under Ideal | Deviation From Ideal |
|---|---|---|---|
| 1 | 636,367 | -24,085 | -3.6% |
| 2 | 636,285 | -24,167 | -3.7% |
| 3 | 663,790 | 3,338 | 0.5% |
| 4 | 675,829 | 15,377 | 2.3% |
| 5 | 689,991 | 29,539 | 4.5% |

The overall population deviation across the districts was 8.2 percent (i.e., the difference between the highest and lowest deviations of 4.5 percent (District 5) and negative 3.7 percent (District 2—the East County district) is 8.2 percent).

## II.

### *Trial Court Proceedings*

A. *The Coalition's Writ Petition*

On March 4, 2022, the Coalition filed a verified petition for writ of mandate or prohibition (petition) in the superior court. The respondents named in the petition were the IRC, the County of San Diego (County), and Cynthia Paes, in her official capacity as the County's registrar of voters. In the operative petition, the Coalition alleged that Chaldeans are a religious and ethnic minority residing in eastern El Cajon, Rancho San Diego, and other neighboring areas.[4] It further alleged that the final 2021 redistricting plan split the Chaldean community and exacerbated the interdistrict population deviation by putting El Cajon in the East County district and Rancho San Diego in the central district. It asserted that the central district was "a solidly Democrat district . . . frustrating the Chaldean minority's ability to elect their Republican candidate of choice."

Based on these allegations, the Coalition stated a single cause of action against the IRC for traditional writ of mandate (Code Civil Proc., § 1085) based on six asserted abuses of discretion. First, it alleged the IRC violated

---

[4] The neighboring areas included Casa de Oro-Mount Helix and parts of Spring Valley. In its appeal, the coalition focuses on the IRC's decision to move Rancho San Diego to the central district. Accordingly, our summary of the trial court proceedings likewise focuses on the coalition's claims with respect to Rancho San Diego.

"the protections for communities of interest codified in the Elections Code," under which the IRC had an asserted "affirmative duty to keep together communities of interest, including religious, ethnic, or racial minority groups." Second, it alleged the IRC violated equal protection guarantees that assertedly "require that communities of interest . . . be kept together." Third, it alleged the IRC "split up the East County Chaldean community[ ] for the purpose of protecting Arab[ ]Muslim or African American communities," thereby violating the "race-neutral redistricting required by Equal Protection guarantees." Fourth, it alleged the IRC violated the equal protection principle of one person, one vote. Fifth, it alleged the IRC violated the VRA (and thus the Elections Code) by "splitting up the East County Chaldean community," frustrating the Chaldean community's ability to elect or influence the election of its candidate of choice. Sixth, it alleged the IRC violated provisions of the Elections Code relating to when draft maps could first be "published to the public."

On the basis of these violations, the Coalition sought a writ of mandate or prohibition directing the IRC "to comply with Election[s] Code sections 21500 and 21552 by not splitting up and diluting the Chaldean community, including specifically by moving all or portions of Rancho San Diego . . . to the East County District 2." It also sought declaratory relief and a preliminary injunction.

B.    *Proceedings on the Writ Petition*

In March 2023, the Coalition filed a motion for issuance of its requested writ of mandate together with supporting declarations and exhibits.[5] The

---

[5]    The San Diego Superior Court has adopted a local rule expressing a preference for the merits of a writ petition to be considered on a noticed motion. (See Super. Ct. San Diego County, Local Rules, rule 2.4.8(A) [in

Coalition argued it had standing to pursue the writ and sought to demonstrate the merits of its claims of racial gerrymandering, violation of the one person, one vote principle, and violation of the VRA (and thus the Elections Code). Its racial gerrymandering and one person, one vote arguments focused on establishing that the IRC's decision to place Rancho San Diego in the East County district or central district was predominantly motivated by considerations of race. It also argued a writ should issue because the IRC's redistricting was arbitrary and capricious for reasons independent of the foregoing violations.

The IRC opposed the motion based on its own supporting evidence. In addition to disputing all of the Coalition's points, the IRC also argued that its final redistricting plan satisfied strict scrutiny. It also lodged the complete, 9,197-page administrative record.[6]

On May 25, 2023, the trial court held a bench trial that ended after less than one calendar day. There was no witness testimony, only attorney arguments. On June 13, the court issued a 31-page statement of decision denying the petition. The court concluded the Coalition lacked standing to pursue the petition and that its claims failed on the merits. The court found the Coalition's racial gerrymandering claim failed because the Coalition did not meet its burden to prove race was the predominant factor in the IRC's drawing of the central district, in large part because the Coalition focused too narrowly on the reasons Rancho San Diego was relocated. It found the

---

seeking mandamus relief, "[t]he noticed motion procedure should be used whenever possible"].)

[6]     The County filed a response brief objecting to deadlines in the coalition's proposed order but otherwise took no position on the merits of the petition.

Coalition's one person, one vote claim failed for similar reasons, including that the Coalition "cites only the placement of Rancho San Diego." The court ruled that the Coalition also failed to establish a VRA violation. Finally, it found the IRC's redistricting was not otherwise arbitrary or capricious so as to support issuance of the requested writ of mandate.

In addition to rejecting the Coalition's arguments, the trial court added a reason of its own. It observed that the Coalition "asks this [c]ourt to order the IRC to draw a map that places the Chaldean community in the East County District" to achieve the Coalition's "stated goal" of placing the Chaldean community in "the East County District which has long been represented by a conservative supervisor." The court found this remedy would violate Elections Code section 21552, subdivision (a)(4), which mandates, "Communities of interest shall not include relationships with political parties, incumbents or political candidates." It added, "Neither the Elections Code nor the VRA nor the Equal Protection clause permits [the Coalition] to dictate that the Chaldean community be placed in a district with a Republican majority. And state law expressly prohibits redistricting on this basis."

On March 25, 2024, the trial court entered judgment. The Coalition timely appealed.[7]

---

[7] The Coalition filed two notices of appeal. The first, which was filed August 2, 2023 and was taken from the statement of decision, was docketed as case No. D082834. The second, which was filed May 23, 2024 and was taken from the judgment, was docketed as case No. D084330. The coalition filed its second notice of appeal only to cure any issues with appellate jurisdiction that may have existed with its first notice of appeal, not to raise additional assertions of error. (See *Meinhardt v. City of Sunnyvale* (2024) 16 Cal.5th 643, 650 [clarifying that in mandate cases the time to appeal runs from entry of judgment].) The appeals have been consolidated under case No. D082834.

DISCUSSION

I.

*The Coalition Has Standing To Bring Its Petition Under the Public Interest Exception*

Because "lack of standing is a jurisdictional defect" (*Loeber v. Lakeside Joint School Dist.* (2024) 103 Cal.App.5th 552, 570 (*Loeber*)), before we address the Coalition's substantive challenges to the judgment, we must consider whether the trial court correctly determined that it lacks standing to pursue this litigation. The Coalition contends the court erred because it meets the requirements for beneficial interest, associational interest, and/or public interest standing. The IRC argues the Coalition fails to meet the requirements for any of these forms of standing. We conclude the court erred in finding the Coalition lacked public interest standing.

A.  *Relevant Legal Principles*

Traditional writs of mandate (Code Civ. Proc., § 1085) are available only for limited purposes, and to pursue them the petitioner must meet certain standing requirements. "A writ of mandate under [Code of Civil Procedure] section 1085 is a vehicle to compel a public entity to perform a legal duty, typically one that is ministerial." (*Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159, 1173 (*City of Pomona*).) "As a general rule, a party must be 'beneficially interested' to seek a writ of mandate." (*Save the Plastic Bag Coalition v. City of Manhattan*

The County has filed a letter brief indicating it takes no position on the merits of this appeal. It also states it wishes to apprise this court of two key dates relevant to the 2026 election cycle: June 2, 2026 (the date of the primary election in the 2026 election cycle) and December 11, 2025 (the deadline by which the County's boundaries must be set for purposes of the primary election).

12

*Beach* (2011) 52 Cal.4th 155, 165 (*Save the Plastic Bag*), citing Code Civ. Proc., § 1086.)  " 'The requirement that a petitioner be "beneficially interested" has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' " (*Save the Plastic Bag,* at p. 165.)  The beneficial interest requirement "is equivalent to the federal injury in fact test, which requires a party to prove by a preponderance of the evidence that it has suffered an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 362 (*Associated Builders & Contractors*) [cleaned up].)  In short, "[t]he beneficial interest must be direct and substantial." (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 219.)

As a separate theory of standing, an organization with no independent direct interest of its own in the outcome of the action can satisfy the beneficial interest requirement based on injury to its members. (*Associated Builders & Contractors*, *supra*, 21 Cal.4th at pp. 361–363.)  This is called associational standing. (*Id.* at p. 361.)

In addition, individual citizens or organizations may qualify for a third category of standing known as public interest standing.  Public interest standing is an exception to the beneficial interest requirement. (*Save the Plastic Bag*, *supra*, 52 Cal.4th at p. 166.)  Under the public interest exception, a petitioner with no beneficial interest in the action may sue "where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty." (*Ibid.* [cleaned up].)  "This public right/public duty exception to the requirement of beneficial interest for a writ

13

of mandate promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right." (*Ibid.* [cleaned up].)

Although the public interest exception is sometimes called citizen standing, it is available to organizations as well as citizens. (*Save the Plastic Bag*, *supra*, 52 Cal.4th at p. 168.) However, application of the exception is "not a given." (*Loeber*, *supra*, 103 Cal.App.5th at p. 569.) "No party, individual or corporate, may proceed with a mandamus petition as a matter of right under the public interest exception." (*Save the Plastic Bag*, at p. 170, fn. 5.) "Rather, public interest standing serves as 'an exception to, rather than repudiation of, the usual requirement of a beneficial interest. The policy underlying the exception may be outweighed by competing considerations of a more urgent nature.'" (*Loeber*, at p. 569, quoting *Save the Plastic Bag*, at p. 170, fn. 5; see *Save the Plastic Bag*, at p. 168 ["Absent compelling policy reasons to the contrary, it would seem that corporate entities should be as free as natural persons to litigate in the public interest."], citing *Green v. Obledo* (1981) 29 Cal.3d 126, 145 (*Green*).)

B.     *Standard of Review*

Standing is a question of law that is generally reviewed de novo. (*Loeber*, *supra*, 103 Cal.App.5th at p. 570.) To the extent the standing decision is based on underlying factual findings, those findings are reviewed for substantial evidence. (*Ibid.*)

However, "[t]here is a split in appellate authority concerning the standard for reviewing a trial court's application of the public interest exception." (*Loeber*, *supra*, 103 Cal.App.5th at p. 570; see *Reynolds v. City of Calistoga* (2014) 223 Cal.App.4th 865, 874–875 [applying abuse of discretion standard of review]; *City of Pomona*, *supra*, 28 Cal.App.5th at p. 1174 [same];

14

*People for Ethical Operation of Prosecutors etc. v. Spitzer* (2020) 53 Cal.App.5th 391, 408 [applying de novo standard of review]; *Loeber*, at p. 571 [same].) *Reynolds* held a trial court's ruling on public interest standing should be reviewed for abuse of discretion. It based its selection on our Supreme Court's statement that public interest standing is not available " 'as a matter of right,' " the inference being that such standing is discretionary. (*Reynolds*, at p. 874, quoting *Save the Plastic Bag*, *supra*, 52 Cal.4th at p. 170, fn. 5.) *City of Pomona*, in turn, relied on *Reynolds* and assumed the abuse of discretion standard applied to a determination of public interest standing. (See *City of Pomona*, at p. 1174.) *Spitzer* disagreed with *Reynolds* and *City of Pomona* and held that de novo is the correct standard, reasoning this is the standard that generally governs review of standing issues, and public interest standing involves questions of public policy that "the appellate process is better suited to deciding." (*Spitzer*, at pp. 408–409.) *Loeber* agreed with *Spitzer* that "[t]he balancing of public policy considerations and legal principles relevant to the trial court's analysis of the public interest exception falls within the ambit of de novo review." (*Loeber*, at p. 571; see *ibid.* [noting that factual findings relevant to standing would be reviewed deferentially based upon substantial evidence].)

Here, we do not need to choose between the abuse of discretion and de novo standards of review. As we will explain, the trial court's denial of public interest standing was based on errors of law, and the IRC has not identified any countervailing interests that would justify denial of public interest standing. Accordingly, we would find the court's ruling erroneous whether we reviewed it independently or for an abuse of discretion. (See *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted [the abuse of discretion standard of review is not unitary; under it, "[t]he trial court's

findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious"].)  Further, because we are persuaded the balance of interests is such that the Coalition should be accorded public interest standing, we need not consider whether it also meets the requirements for beneficial interest standing or associational standing.

C.    *Analysis*

In its trial court briefs, the Coalition argued it should be accorded public interest standing based on the weight of the public interest and sharpness of the public duty it sought to vindicate by its petition.  It relied on *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 440 (*Common Cause*), in which our Supreme Court held the public interest exception applied to an action in which the plaintiffs sought to require local officials to deputize county employees as voting registrars.  The Coalition asserted that voting rights cases "are essentially *per se* cases where public interest standing is appropriate because the public duty is sharp and the public need weighty."

The trial court here found the Coalition did not merit public interest standing.  It did not evaluate the public duties and public interests implicated by the Coalition's petition.  Instead, its reasons for denying public interest standing were intertwined with the reasons it found the Coalition ineligible for associational standing.  On the question of associational standing, the court was unconvinced the Coalition possessed traditional individual members.  It found that the Coalition's corporate directors were not members based on language in the Coalition's corporate bylaws.  It rejected the Coalition's claim that individuals who completed an online survey qualified as members because there was no evidence they influenced

16

the Coalition's activities. It further found that even if it were to consider the Coalition's two corporate officers as members, neither resided in the central district as required to show they had a direct beneficial interest in the racial gerrymandering or population deviation alleged in the petition.

Turning to the question of public interest standing, the trial court began its analysis by stating, "[E]ven an organization's public interest standing is derivative of its members' standing." It stated the purpose of a standing requirement is to ensure plaintiffs "have a sufficient interest in the outcome." It then reasoned that although the Coalition based its claim on a purported injury to central district residents, its two officers were residents of the East County district. The court found the Coalition therefore failed to show it adequately represented the interests of the residents of the central district whose alleged voting injuries were at the heart of the Coalition's claims. It then relied on this asserted deficiency as justification for declining to exercise its discretion to grant the Coalition public interest standing.

The trial court's conclusion rested on two legal errors. First, the court improperly treated the test for public interest standing as indistinguishable from associational standing, in which at least one of an organization's individual members must have a beneficial interest in the action in order for the organization to sue. (See, e.g., *San Francisco Apartment Assn. v. City and County of San Francisco* (2016) 3 Cal.App.5th 463, 472–474 (*San Francisco Apartment*) [discussing associational interest standing].) But public interest standing is an exception to the beneficial interest requirement. Its focus is not on the organization's or its members' harm, but on the nature of the public right and public duty at issue in the petition. " '[W]here the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that

17

he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced.' " (*Hollman v. Warren* (1948) 32 Cal.2d 351, 357; accord, *Green, supra*, 29 Cal.3d at p. 144; *Common Cause, supra*, 49 Cal.3d at p. 439.)

The trial court appears to have incorrectly concluded that an organization's public interest standing is merely derivative of the standing of its individual members by relying on *City of Pomona, supra*, 28 Cal.App.5th at page 1177. But in the cited part of *City of Pomona* the appellate court rejected a party's reliance on the test for associational standing to overturn a grant of public interest standing. (See *ibid.* [discussing *San Francisco Apartment, supra*, 3 Cal.App.5th at p. 472].) Although the appellate court disposed of the challenge by concluding the organization did not fail the associational interest test, *City of Pomona* does not stand for the affirmative proposition that to merit public interest standing an organization must show its members satisfy the requirements for associational standing. The opposite is true. (See *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 916 [organization had public interest standing to challenge a city's actions "even if neither [the organization] nor any of its members have a direct and substantial beneficial interest in the issuance of the writ"].)

Second, not only did the trial court improperly conflate the requirements of associational standing and public interest standing, it also failed to consider the weight of the public right or public duty at issue. As the Coalition has argued first in the trial court and now on appeal, the essential question for purposes of public interest standing is the subject matter of the petition. And voting rights have been held by our high court to be sufficiently weighty to support public interest standing. (*Common Cause, supra*, 49

18

Cal.3d at p. 439.) The plaintiffs in *Common Cause* were a taxpayer and several organizations concerned with voting rights who sought to require Los Angeles County to implement a program deputizing as voting registrars certain county employees with frequent contact with non-White and low income citizens. (*Id.* at p. 437.) The California Supreme Court held the plaintiffs had public interest standing simply because "[t]he question in this case involves a public right to voter outreach programs." (*Ibid.*)

As in *Common Cause*, the Coalition's petition also seeks to vindicate voting rights. And indeed the specific public duties at issue—ensuring constitutional boundary creation and apportionment of a supervisorial district—are indisputably sharp. And while the violations alleged in the petition involve only one district, we do not perceive this limitation as making the public need for enforcement insufficiently weighty. Indeed, in *Common Cause* the voting registrar program sought by the plaintiffs would have assisted only certain county citizens, and yet this circumstance did not lead our high court to reject public interest standing. We therefore agree with the Coalition that under *Common Cause* its petition meets the requirements for public interest standing.

At the same time, we acknowledge the public interest exception, even where potentially applicable, may nevertheless "be outweighed in a proper case by competing considerations of a more urgent nature." (*Green, supra*, 29 Cal.3d at p. 145; accord, *Save the Plastic Bag, supra*, 52 Cal.4th at p. 168.) Where such overriding competing considerations are shown to exist, they may therefore justify a discretionary denial of public interest standing. (See, e.g., *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 798 [individual member of administrative agency lacked standing to challenge agency's rulings, in part to avoid fostering internal agency struggles "because

19

of the inevitable damage such lawsuits will inflict upon the administrative process"]; *Save the Plastic Bag*, at p. 169 [stating it would be improper for a petitioner to "attempt to use CEQA to impose regulatory burdens on a business competitor, with no demonstrable concern for protecting the environment"].)

Here, however, the IRC has not identified any legitimate countervailing considerations. It merely argues that the Coalition does not have members who live in the central district, and thus repeats the same flawed logic used by the trial court. Nor have we identified on our own countervailing considerations that would override the public duties the Coalition seeks to vindicate. We considered that the petition seeks a writ directing the IRC to alter the relevant districts and that the trial court found this relief improperly political and otherwise legally unsupported. Moreover, as we later explain, the Coalition has not challenged this ruling. Even so, in *Common Cause* our Supreme Court granted public interest standing even though the relief the petitioners sought and obtained would have exercised too much control over the discretion of government officials. (*Common Cause*, *supra*, 49 Cal.3d at pp. 444–446.) That the petition has been held to seek relief that is improper does not appear to be a sufficient basis for denying public interest standing, as it would conflate the merits of the challenge with the standing to bring it.

For these reasons, including the significance of the public right and public duty at issue in the petition and the absence of any identified countervailing considerations, we conclude the Coalition's petition falls within the exception for public interest standing and the trial court erred when it determined otherwise.

## II.

*The Coalition Fails To Show the Trial Court Erred When It Declined To Issue the Requested Writ*

The Coalition brought this appeal to challenge the trial court's denial of its petition for writ of mandate. However, in its opening brief it expressly waives any claim of error with respect to the court's determination there was no VRA violation as well as the court's rejection of most grounds on which it claimed the redistricting was arbitrary and capricious. The Coalition only challenges the court's disposition of its racial gerrymandering and one person, one vote claims as well as a single component of its claim of arbitrary and capricious redistricting. And it only contests the court's denial of writ relief. Any challenges to the court's disposition of the remaining violations of law and requests for relief asserted in the petition have therefore been forfeited. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [issue not raised on appeal deemed waived]; *Eck v. City of Los Angeles* (2019) 41 Cal.App.5th 141, 146 [same].)

The Coalition's first two challenges are directed at the trial court's determination that it failed to prove its racial gerrymandering and one person, one vote claims. Its third challenge is directed at the court's finding that it failed to otherwise establish that a writ should issue because the IRC's redistricting was arbitrary and capricious. We consider these challenges in turn.

A. *The Trial Court Did Not Err When It Found the Coalition's Racial Gerrymandering and One Person, One Vote Claims Too Limited in Their Geographic Scope*

In its first challenge, the Coalition claims the trial court erred when it determined the Coalition's theories of racial gerrymandering and violations of

21

the one person, one vote principle were too limited because they focused only on the IRC's relocation of Rancho San Diego. The Coalition characterizes the court's rulings as a determination that Rancho San Diego is "too small" to be legally significant. As we will explain, the argument lacks merit.

1. *Standard of Review*

"A writ of mandate under Code of Civil Procedure section 1085 (i.e., an ordinary mandamus action) compels the 'performance of a legal duty imposed on a government official.' " (*Abatti v. Imperial Irrigation Dist.* (2020) 52 Cal.App.5th 236, 250 (*Abatti*).) "This type of writ petition seeks to enforce *a mandatory and ministerial duty* to act on the part of an administrative agency or its officers." (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 279 (*CV Amalgamated*) [cleaned up].) "The writ will not lie to control discretion conferred upon a public officer or agency. Under this theory of relief, mandamus may issue to compel an official both to exercise his discretion (if he is required by law to do so) and to exercise it under a proper interpretation of the applicable law." (*Ibid.* [cleaned up].)

"An ordinary mandamus suit permits judicial review of quasi-legislative acts of public agencies. In reviewing such quasi-legislative decisions, the trial court does not inquire whether, if it had power to act in the first instance, it would have taken the action taken by the administrative agency. The authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." (*Abatti, supra,* 52 Cal.App.5th at p. 250 [cleaned up].)

When we review a judgment on a petition for writ of mandate, to the extent the appeal challenges findings of fact made by the trial court in the

course of its denial of such a petition, we review the findings deferentially.[8] (See, e.g., *Quesada v. County of Los Angeles* (2024) 106 Cal.App.5th 880, 888; *CV Amalgamated, supra*, 82 Cal.App.5th at p. 280; *Abatti, supra*, 52 Cal.App.5th at p. 250; *Womack v. San Francisco Community College Dist.* (2007) 147 Cal.App.4th 854, 858.) We independently review the trial court's conclusions on questions of law. (*CV Amalgamated*, at p. 280; *Abatti*, at p. 250.)

Another principle of appellate review has particular relevance here. We approach this appeal, like any appeal, with the presumption the appealed judgment is correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) The burden is therefore on the Coalition "to demonstrate . . . that the trial court

---

[8] The Coalition variously urges us to apply either the federal clear error standard of review or the state law substantial evidence standard of review to the trial court's factual findings. However, we ultimately do not need to choose between these standards because the Coalition's appellate arguments do not require us to consider whether the court made an incorrect factual finding.

Relatedly, we disagree with the Coalition to the extent it implies that it completed the steps necessary to avoid the doctrine of implied findings by objecting to the trial court's statement of decision. Avoiding the doctrine of implied findings is a two-step process that requires compliance with sections 632 and 634 of the Code of Civil Procedure. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133; *People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 525.) Here, the parties did not complete the first step. Although trial counsel orally requested a statement of decision before the trial court took the matter under submission (thus satisfying the relevant timing requirement), counsel failed to "specify [any] controverted issues." (Code Civ. Proc., § 632.) A nonspecific request for statement of decision does not compel a statement on the omitted issues. (*City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1292.) Accordingly, "we are free to follow our usual appellate course and *imply . . .* findings to support the ruling." (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1313.)

committed an error that justifies reversal of the judgment." (*Ibid.*; see *Campbell v. Los Angeles Unified School Dist.* (2024) 102 Cal.App.5th 156, 161 [affirming trial court ruling where appellant failed to carry burden of demonstrating error].) " 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Jameson*, at p. 609; see *Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772–773 [rejecting appellate challenge where appellant failed to show alleged error by the trial court was prejudicial].) Further, "[b]ecause of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his [or her] brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 (*Paterno*).) We are not required to "examine undeveloped claims, nor to make arguments for parties." (*Ibid.*)

### 2. *Racial Gerrymandering*

The equal protection clause of the Fourteenth Amendment to the United States Constitution "prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.' " (*Bethune-Hill v. Va. State Bd. of Elections* (2017) 580 U.S. 178, 187 (*Bethune-Hill*).) The harms that flow from such "[r]acial gerrymandering" (*Shaw v. Reno* (1993) 509 U.S. 630, 657) include " 'being personally subjected to a racial classification as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group' " (*Bethune-Hill*, at p. 187).

At the same time, the United States Supreme Court has recognized that " 'redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it

is aware of . . . a variety of other demographic factors.' " (*Bethune-Hill*, *supra*, 580 U.S. at p. 187.)  Thus, due to " 'the complex interplay of forces that enter a legislature's redistricting calculus,' " the Supreme Court has repeatedly emphasized that courts "must 'exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.' " (*Alexander v. S.C. State Conf. of the NAACP* (2024) 602 U.S. 1, 7 (*Alexander*).)  "And the 'good faith of [the] state legislature must be presumed.' " (*Abbott v. Perez* (2018) 585 U.S. 579, 603 (*Abbott*).)

In light of these considerations, the Supreme Court "has held that a plaintiff alleging racial gerrymandering bears the burden 'to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.' " (*Bethune-Hill*, *supra*, 580 U.S. at p. 187.)  To make this showing, "a plaintiff must prove that the State 'subordinated' race-neutral districting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'  . . . Racial considerations predominate when '[r]ace was the criterion that, in the State's view, could not be compromised' in the drawing of district lines." (*Alexander*, *supra*, 602 U.S. at p. 7, citation omitted.)  "This showing can be made through some combination of direct and circumstantial evidence." (*Id.* at p. 8.)

Further, a court cannot make a finding of racial predominance without considering the entire district.  "[T]he basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." (*Bethune-Hill*, *supra*, 580 U.S. at p. 191.)  "Courts evaluating racial predominance therefore should not divorce any portion of the lines . . . from the rest of the district." (*Id.* at pp. 191–192.)  "This is not

25

to suggest that courts evaluating racial gerrymandering claims may not consider evidence pertaining to an area that is larger or smaller than the district at issue." (*Id.* at p. 192.) "The ultimate object of the inquiry, however, is the legislature's predominant motive for the design of the district as a whole. A court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context." (*Ibid.*)

Only if the plaintiff succeeds in proving racial predominance will the burden shift to the defendant "to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." (*Cooper v. Harris* (2017) 581 U.S. 285, 292 (*Cooper*).) These principles apply to redistricting at the local as well as the state level. (See, e.g., *Lee v. City of Los Angeles* (9th Cir. 2018) 908 F.3d 1175, 1178 [evaluating claim city council district boundaries were drawn for predominantly racial reasons].)

### 3. *One Person, One Vote*

In addition to prohibiting racially motivated district boundaries, the federal equal protection clause also embodies the concept that " 'the Constitution visualizes no preferred class of voters' " and the related idea that " 'every voter is equal to every other voter in his [or her] State.' " (*Reynolds v. Sims* (1964) 377 U.S. 533, 558.) Under the principle of one person, one vote, states and local governments must be "apportioned *substantially* on an equal basis for the purpose of electing legislative representatives." (*Griswold v. County of San Diego* (1973) 32 Cal.App.3d 56, 60.) Because the principle only insists on substantial equality, minor deviations do not require official justification. (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 472.)

26

In a unanimous case, the Supreme Court summarized the law that currently applies to an alleged violation of the one person, one vote principle. (*Harris v. Ariz. Indep. Redistricing Comm'n* (2016) 578 U.S. 253, 258–259 (*Harris*).) The federal equal protection clause "requires States to 'make an honest and good faith effort to construct [legislative districts] . . . as nearly of equal population as is practicable.' " (*Id.* at p. 258.) However, deviation from equality is permitted "when it is justified by 'legitimate considerations incident to the effectuation of a rational state policy.' " (*Ibid.*) Legitimate considerations can include " 'traditional districting principles such as compactness [and] contiguity,' " "a state interest in maintaining the integrity of political subdivisions . . . or the competitive balance among political parties," and compliance with the VRA. (*Ibid.*, citation omitted.) Further, " 'minor deviations from mathematical equality' do not, by themselves, 'make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.' " (*Id.* at p. 259.) "[M]inor deviations" are "those in 'an apportionment plan with a maximum population deviation under 10 [percent].' " (*Ibid.*)

Therefore, "those attacking a state-approved plan" as a violation of the one person, one vote principle "must show that it is more probable than not that a deviation of less than 10 [percent] reflects the predominance of illegitimate reapportionment factors rather than . . . 'legitimate considerations' . . . . Given the inherent difficulty of measuring and comparing factors that may legitimately account for small deviations from strict mathematical equality, we believe that attacks on deviations under 10 [percent] will succeed only rarely, in unusual cases." (*Harris*, *supra*, 578 U.S. at p. 259.)

27

4.     *Analysis*

The Coalition presents two arguments, the first directed at one of the trial court's reasons for rejecting its racial gerrymandering claim. As mentioned, the trial court concluded the Coalition failed to meet its burden to prove racial predominance and identified several reasons why it reached this conclusion. The Coalition's argument focuses on the first of these reasons.

We will quote the trial court's statement of decision because its language reveals the flaw in the Coalition's argument. The court stated: "First, Rancho San Diego, with its population of 21,000 or only three percent of the entire [c]entral [d]istrict, cannot form the basis for a claim the IRC allowed race to predominate when it drew the entire district. In a racial predominance claim, 'the court should not confine its analysis to the conflicting portions of the lines. That is because the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district.' (*Bethune-Hill*[, *supra*,] 580 U.S. [at p.] 191.) 'Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence[.] A holistic analysis is necessary to give that kind of evidence its proper weight.' *(Id.* at p. 192.) Despite the required holistic analysis, [the Coalition] focused only on the decision regarding Rancho San Diego and ignored the IRC's consideration of other factors in drawing the [c]entral [d]istrict." The court then cited the administrative record and parenthetically listed other, race-neutral factors the IRC considered, including population balance, compactness, and protections for communities of interest.

The Coalition, referring to this passage, claims the trial court rejected its racial gerrymandering claim on the ground Rancho San Diego lacks a "significant number of voters." (See *Bethune-Hill*, *supra*, 580 U.S. at p. 187.)

28

The Coalition claims this ruling was incorrect "as a matter of law" and cites federal district court cases in which populations smaller than Rancho San Diego were found to be legally significant.[9] (*Perez v. Abbott* (W.D.Tex. 2017) 267 F.Supp.3d 750, 792 (*Perez II*) [14,102 voters, or 8.4 percent of district's population, legally significant], reversed on other grounds in *Abbott, supra,* 585 U.S. at pp. 584–585; *Alabama Legislative Black Caucus v. Alabama* (M.D.Ala. 2017) 231 F.Supp.3d 1026, 1261, 1340 [637 people not legally significant; 3,432 people legally significant].)

This argument fails because it is based on a misinterpretation of the statement of decision. The Coalition is simply incorrect that the trial court rejected its claim on the ground Rancho San Diego has a legally insignificant number of voters. Rather, the court ruled that the Coalition's focus on Rancho San Diego was geographically too limited in light of the *Bethune-Hill* rule that in evaluating a racial gerrymandering claim a court may not "[c]oncentrat[e] on particular portions" of district boundaries "in isolation." (*Bethune-Hill, supra,* 580 U.S. at p. 192.) Although the court admittedly referenced the population of Rancho San Diego, it did not go on to find the number of voters residing in that area to be legally significant, a relevant but distinct consideration. (See *id.* at p. 187 [plaintiff alleging racial gerrymandering must show race was the predominant factor " 'motivating the legislature's decision to place a significant number of voters within or without

---

9    The Coalition cites three district court cases, including *Covington v. N.C.* (M.D.N.C. 2016) 316 F.R.D. 117, 149 (*Covington*), but we are unable to find within *Covington* support for the coalition's claim the district court found 0.58 percent of a district's population "was legally significant." The Coalition also relies on *Legislature of California v. Reinecke* (1973) 10 Cal.3d 396, but *Reinecke* is inapposite because it did not involve a racial gerrymandering claim.

a particular district' "]; see *Perez II*, *supra*, 267 F.Supp.3d at p. 792 [treating as two separate issues whether "race-based changes" to plans "affect most portions of the district and thus the design of the district as a whole" and "involve a significant number of voters"].)  Given these textual cues, we disagree with the Coalition's premise that the court rejected its racial gerrymandering claim on the ground Rancho San Diego lacks a legally significant number of voters.  Because the premise of the Coalition's argument fails, so too does the argument.

The Coalition's next argument is directed at the trial court's rejection of its one person, one vote claim.  It contends the court erred when it found the Coalition focused too narrowly on "the placement of Rancho San Diego."  The Coalition states "this inquiry is irrelevant" to a one person, one vote claim.  It cites *Perez v. Abbot* (W.D.Tex. 2017) 250 F.Supp.3d 123, 194 (*Perez I*), in which the district court stated "the geographic scope of a one person, one vote claim . . . is whatever the plaintiff makes it.  These challenges can be plan-wide, location-specific, or both."  In essence, the Coalition's argument is that under *Perez I*, the geographic scope of a one person, one vote claim can be as "location-specific" as a discrete part of a district.

The argument lacks merit because *Perez I*, the Coalition's sole cited authority, does not stand for that proposition.  The plaintiffs in *Perez I* asserted one person, one vote claims based on population deviations among legislative districts, but their theory of malapportionment relied on a case that involved a challenge to a redistricting plan as a whole.  (*Perez I*, *supra*, 250 F.Supp.3d at pp. 130, 191, citing *Larios v. Cox* (N.D.Ga. 2004) 300 F.Supp.2d 1320 (*Larios*), aff'd sub nom *Cox v. Larios* (2004) 542 U.S. 947.)  Before addressing the merits of the plaintiffs' one person, one vote claims, the district court therefore considered the question of whether such claims could

30

"be made against specific districts." (*Perez I,* at p. 191.) The language quoted by the Coalition comes from this part of the court's decision.

However, although the district court in *Perez I* used broad language that included the phrase "location-specific," we see no indication that by using this language the court was intending to approve claims based on mere subparts of a district. Several aspects of the decision make this clear. First, the claims the court was evaluating involved entire districts. Second, the question the court was attempting to answer was whether one person, one vote claims could "be made against specific districts." (*Perez I*, *supra*, 250 F.Supp.3d at p. 191.) Third, the court answered this inquiry by surveying Supreme Court cases involving one person, one vote claims, including the Supreme Court's most recent *Harris*, *supra*, 578 U.S. 253 decision. (See *Perez I*, at pp. 192–195.) Most of these decisions involved challenges to entire redistricting schemes or plans and "not to individual districts." (*Id.* at pp. 192–193, citing *Reynolds v. Sims*, *supra*, 377 U.S. at pp. 560, 586 [addressing "apportionment schemes" or "plans"]; *Gaffney v. Cummings* (1973) 412 U.S. 735, 751–752 [apportionment plan]; *White v. Regester* (1973) 412 U.S. 755, 763–764 [apportionment plan].) The court stated *Larios* also "fits this mold," as did *Harris*. (*Perez I,* at p. 193, quoting *Larios*, *supra*, 300 F.Supp.2d at p. 1357 [reapportionment plans], *Harris*, *supra*, 578 U.S. at p. 255 [redistricting plan].)

The *Perez I* district court decided a one person, one vote claim could involve less than a complete redistricting plan only after observing that in two cases the Supreme Court had addressed claims involving challenges to "specific districts." (*Perez I*, *supra*, 250 F.Supp.3d at pp. 193–195, discussing *Connor v. Finch* (1977) 431 U.S. 407, 421, fn. 19 ["several districts"], *Brown v. Thomson* (1983) 462 U.S. 835, 846–848 [claim arose from decision to give one

31

representative to an underpopulated district].)  In particular, the court noted the *Brown* majority declined to consider the constitutionality of an entire redistricting plan because the plaintiffs had limited their challenge to one representative district (Niobrara County), whereas the dissenting justices would have considered the constitutionality of the entire plan.  (*Perez I*, at p. 194, citing *Brown*, at pp. 846 [majority], 850–861 [dissent].)  The court found the "split between the majority and dissent in *Brown* explains the geographic scope of a one person, one vote claim—it is whatever the plaintiff makes it.  These challenges can be plan-wide, location-specific, or both." (*Perez I*, at p. 194.)  Thus, when the court talked about the permissibility of a "location-specific" challenge, it was referring to the challenge impliedly sanctioned by the *Brown* majority—a challenge to an entire district. Confirming this is what the district court had in mind, the court went on to explain that one person, one vote claims are similar to racial gerrymandering claims in that "a plan with population deviations will overvalue voters in underpopulated districts and undervalue voters in overpopulated districts. . . .  Thus, like a voter in a racially gerrymandered district, a voter in an overpopulated district suffers a harm that is personal to him and is not necessarily experienced by a voter in another part of a state.  This explains why a one person, one vote challenge, like a racial gerrymandering claim, can be brought *on a district-by-district basis*."  (*Perez I*, at p. 195, italics added.)

For these reasons, we do not read *Perez I* to authorize a one person, one vote claim with a geographic scope smaller than a district.  The Coalition's reliance on that case therefore does not persuade us the trial court erred when it found the Coalition's focus to be too narrow because the Coalition addressed "only the placement of Rancho San Diego."

Finally, the Coalition appears to fault the trial court for citing *Larios*, *supra*, 300 F.Supp.2d at page 1321 (which the court referred to as "*Cox*" and the Coalition refers to as "*Cox I*"). The gist of its criticism appears to be that *Cox I* (i.e., *Larios*) is inapposite. But that was the court's point, too: it stated this case is "[u]nlike . . . the *Cox* case." And while the Coalition appears to contend that *Larios*, which it acknowledges was "not a racial redistricting case," somehow shows that systemic overpopulation of a district is "not the *only* way of proving a violation," it does not explain its assertion, nor does it cite to any part of *Larios* that stands for that proposition. Instead, it merely cites the Supreme Court's summary affirmance of *Larios*, which does not have independent explanatory value. (See *Cox v. Larios*, *supra*, 542 U.S. at p. 947 ["The judgment is affirmed."].) Accordingly, we reject this argument because it is too conclusory and underdeveloped to demonstrate error.

B. *The Trial Court's "Racial Predominance Conclusion" Is Not Unsupported*

The Coalition's next challenge focuses on some of the trial court's other reasons for finding it failed to prove racial predominance. It asserts three arguments, each directed at a different part of the statement of decision.

The Coalition's first argument is a mere observation. The Coalition acknowledges the trial court found it failed to carry its burden of proof that the IRC subordinated other redistricting factors to race because the Coalition focused too narrowly on Rancho San Diego in isolation while ignoring other factors or principles the IRC considered when it drew the central district. It further acknowledges the court found these other factors included population equality, compactness, and protections for communities of interest. It does not dispute the accuracy of this finding. Instead, it simply observes that

33

"[o]utside" the factors identified, the statement of decision "did not directly address the issue of what actually was the IRC's intent."

We discern no claim of error in this observation. Indeed, the observation itself is a tacit admission the trial court addressed the IRC's intent when it listed the race neutral redistricting factors the IRC considered when it drew the central district. The Coalition does not argue that the court was required to do more. (Cf. *Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125 [a statement of decision "need do no more than state the grounds upon which the judgment rests"].) If it intended for its observation to raise a claim of error, the claim has been forfeited because the Coalition has not presented an appropriately developed argument. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 701, fn. 15 (*Meridian*) [failure to develop an argument forfeits that point]; *Paterno, supra*, 74 Cal.App.4th at p. 106 [an appellate court is not required to develop the parties' arguments].)

In its second argument, the Coalition takes aim at another ruling. In the relevant part of the statement of decision, the trial court rejected the Coalition's argument that the IRC's decision to move Rancho San Diego to the central district was primarily motivated by a " 'desire to place the African[ ]American community in the [c]entral [d]istrict 4.' " The court observed that the IRC had moved Rancho San Diego to the central district as part of a final map amendment that involved three possible scenarios. The first scenario resulted in the central district having a citizen voting age population (CVAP) that was 10.9 percent African American. The third scenario, which was ultimately adopted, resulted in the central district having a CVAP that was 10.2 percent African American. The court found the IRC's rejection of scenario 1, in which the African American CVAP in the

34

central district was the highest, was evidence the IRC "did not allow race to predominate its decisions." The court explained that if the IRC had subordinated all redistricting principles to the objective of placing African American voters in the central district, "the IRC necessarily would have adopted the map with the highest number of African[ ]American voters."

The Coalition claims the trial court's reasoning was erroneous because the court "wrongly assume[d]," in violation of *Bethune-Hill*, *supra*, 580 U.S. at page 190, "that 'a conflict or inconsistency between the enacted plan and traditional redistricting criteria is . . . a threshold requirement.' " We disagree. The error identified in the cited part of *Bethune-Hill* arose when the district court declined to consider all district boundaries challenged by voters asserting racial gerrymandering claims. Rather than review the complete district boundaries, the district court "limited its inquiry into racial motive to those portions of the district lines that appeared to deviate from traditional criteria." (*Id*. at p. 186.) In effect, the district court required the challengers to demonstrate as a precondition for considering their racial gerrymandering claims that the challenged boundaries were irregular and could not be explained " 'other than on the basis of race.' " (*Id*. at p. 188.)

Here, the trial court did not commit such an error. It did not refuse to consider any district lines challenged by the Coalition for lack of irregularity or improperly make the Coalition demonstrate a conflict between the challenged boundary and traditional principles as a prerequisite to considering its racial gerrymandering claim. Rather, the court simply identified an inconsistency between the circumstantial evidence—the increase in African American CVAP resulting from the relocation of Rancho San Diego—and the Coalition's claim of a predominantly racial motivation. This is consistent with, rather than violative of, *Bethune-Hill*, including its

instructions that to properly analyze a racial gerrymandering claim, a court must focus on the redistricting body's "actual considerations" (*Bethune-Hill*, *supra*, 580 U.S. at pp. 189–190) and determine whether " 'race for its own sake . . . was the legislature's dominant and controlling rationale' " (*id.* at p. 188).[10]

The Coalition's third argument is directed at yet another of the trial court's reasons for finding it failed to meet its burden to prove racial predominance. One of the factual theories advanced by the Coalition in its trial court briefs had to do with the term "BIPOC." The Coalition asserted that BIPOC "is an acronym that stands for 'Black, Indigenous, and People of Color.' " It cited places in the administrative record where commissioners

---

[10]    To the extent the Coalition asserts in its opening brief the trial court committed the same asserted error with respect to "the other subordinated redistricting criteria," the Coalition fails to develop the assertion into a coherent argument to explain the nature of the purported error. As a result, the point is forfeited. (*Meridian, supra,* 67 Cal.App.5th at p. 701, fn. 15; *Paterno, supra*, 74 Cal.App.4th at p. 106.)

In its reply brief, the Coalition quotes language from a passage from pages 71 and 72 of its opening brief but omits language through the use of ellipses. It thus appears to recast certain of its opening brief assertions as an appellate claim the IRC's final map subordinated traditional redistricting principles. The recast claim is underdeveloped and lacking in logical analysis as well as new (and therefore belated), all of which results in forfeiture of the point. (*Meridian, supra*, 67 Cal.App.5th at p. 701, fn. 15; *Paterno, supra*, 74 Cal.App.4th at p. 106; see *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [omissions in opening briefs cannot be rectified in reply briefs].) In any event, it also lacks merit. The Coalition simply refers us back to an argument from its trial court brief that the decision to relocate *Rancho San Diego* violated principles of population equality, compactness, and protection of the Chaldean community of interest. But the trial court implicitly found the IRC considered traditional principles when drawing the central district as a whole. The Coalition does not persuade us the court erred because it does not "take account of the districtwide context." (*Bethune-Hill, supra*, 580 U.S. at p. 192.)

used the term in phrases like "BIPOC community" or in referring to the central district as a "BIPOC district."  The Coalition argued that by "making its redistricting decisions to support a 'BIPOC' district" the IRC "was explicitly proceeding on suspect race-based grounds."  The court found the Coalition's argument that "the IRC's referral to the [c]entral [d]istrict at times as the 'BIPOC district' " failed to meet its burden.  It explained that "BIPOC" was a term that could "mean many things" but found it was used more often than not by the IRC to refer to "the immigrant and refugee community, a community based on characteristics other than simply race."  The court cited four examples in the administrative record reflecting this usage.

In its opening brief on appeal, the Coalition contends the trial court erred and ignored "statements directly stating that Rancho San Diego was included in the central district because of its African[ ]American community."  It points to statements made by two commissioners during the December 11, 2021 discussions of the final mapping amendment that resulted in Rancho San Diego being relocated to the central district.[11]  It contends the "IRC in

---

[11]     The first cited statement was by the commissioner who proposed the scenario 3b map amendment.  This commissioner stated his intent "was particularly to do two things:  To move El Cajon . . . into [East County] District 2 as part of the East County area, and also to sort of consolidate . . . the BIPOC community into [central] [d]istrict 4."  The Coalition contends this commissioner "used 'BIPOC' synonymously with 'Black.' "  The second cited statement was made by a different commissioner about the same map amendment.  This commissioner stated, "Spring Valley, Paradise Hills, Casa de Oro, San Diego . . . was a community of interest to the Black community, the historical Black community in this area" and the proposed map amendment "was about keeping Paradise Hills, . . . Spring Valley, . . . Rancho San Diego together."  In the same comment, this commissioner also stated, "Rancho San Diego isn't just about keeping it with El Cajon or keeping in

37

general" agreed with the statements.[12]  It claims the court ignored these "direct statement[s] of legislative intent."  In its reply brief, it again argues that certain statements of commissioners are *direct evidence* of legislative intent" as to "why the IRC placed Rancho San Diego in the Central District."  It cites Supreme Court and federal district court cases addressing the use of direct evidence to prove racial gerrymandering claims.

The Coalition fails to demonstrate either error or reversible error for several reasons.  First, its attack on the trial court's ruling rejecting the Coalition's argument meaning the IRC gave to the phrase "BIPOC district" is misplaced.  The court did not purport to address in that ruling all statements made by commissioners about the reasons that motivated them to relocate Rancho San Diego to the central district, a decision made at the tail end of the mapping process after the majority of decisions about the boundaries and composition of the central district had already been made.  Rather, it rejected the distinct theory that the IRC's references "at times" to the central district as a "BIPOC district" showed race was the factor that predominated over other, permissible factors in the IRC's creation of the central district as a whole.  The Coalition does not present in its opening brief a developed argument that the court erroneously rejected this theory.  As a result, any such argument has been forfeited.  (*Meridian, supra,* 67 Cal.App.5th at p. 701, fn. 15; *Paterno, supra,* 74 Cal.App.4th at p. 106.)

---

East County or keeping it with the Chaldeans" and added "they're all legitimate factors that we have to weigh and consider."

[12]    In support of this assertion, the Coalition cites a different section of its opening brief in which it quotes statements made during "the discussion of Rancho San Diego" that it contends show certain other commissioners voted for the scenario 3b map amendment "because of the African[ ]American community" or "BIPOC, non-White population" of Rancho San Diego.

Instead, the Coalition's claim is that the trial court ignored "statements directly stating that Rancho San Diego was included in the central district because of its African[ ]American community." We are not persuaded by this argument because the court squarely addressed this category of proof when it ruled that the Coalition's focus on the IRC's decision to relocate Rancho San Diego was too narrow and insufficiently holistic, and "ignored the IRC's consideration of other factors in drawing the [c]entral [d]istrict," in violation of *Bethune-Hill*, *supra*, 580 U.S. at pages 191 and 192. For the reasons we have discussed, the Coalition fails to show this ruling was legally erroneous.

The Coalition has also not challenged in its opening brief the trial court's finding that the IRC considered race-neutral factors that were not shown to have been predominated by the assertedly race-based reasons that motivated it to relocate Rancho San Diego. As a result, we presume the finding is correct. (See *PR/JSM Rivara LLC v. Community Redevelopment Agency* (2009) 180 Cal.App.4th 1475, 1486 [trial court's unchallenged factual findings presumed correct on appeal].) The Coalition's appellate reliance on statements that purportedly show the IRC relocated Rancho San Diego for race-based reasons runs headlong into the court's presumptively correct ruling that in drawing the central district as a whole, the IRC relied on race neutral factors that were not shown to have been predominated by the assertedly race-motivated reasons that led certain commissioners to decide to relocate Rancho San Diego to the central district.

The Coalition simply asserts that it presented direct evidence of certain commissioners' race-based reasons for relocating Rancho San Diego without demonstrating this evidence shows the trial court erred when it found the Coalition failed to prove racial predominance. "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes

39

whether the evidence compels a finding in favor of the appellant as a matter of law. . . . Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279, citations omitted.)

The Coalition fails to show the answer to both parts of this question is yes. It does not establish that the statements it cites on appeal are of such a character the court was required as a matter of law to find it met its burden to prove racial predominance. The Coalition does not present in its opening brief a developed argument explaining why as a matter of law the statements met its burden to prove race was the factor that predominated over the other traditional factors considered by the IRC when it designed the central district as a whole. It argues only that the statements show the IRC's racial motivations for approving the map amendment that resulted in Rancho San Diego's relocation to the central district. Its appellate arguments thus fall short of demonstrating reversible error because they do not "take account of the districtwide context." (*Bethune-Hill*, *supra*, 580 U.S. at p. 192.)

And although the Coalition cites cases addressing the significance of direct evidence of intent, they do not stand for the proposition that direct evidence a mere segment of a district was placed in the district for assertedly racial motivations is sufficient as a matter of law to meet its burden to prove race was the factor that predominated in the drawing of the entire district. The Supreme Court cases cited in the Coalition's briefs either stand for the general proposition that direct evidence may be used to prove racial gerrymandering (*Cooper*, *supra*, 581 U.S. at p. 291), or they are distinguishable because the direct evidence they discussed, unlike the

40

statements cited by the Coalition, addressed official motives for the design of an entire district rather than a mere part of a district. (See, e.g., *Miller v. Johnson* (1995) 515 U.S. 900, 917, 918 ["considerable . . . evidence," including state's own concessions, established that a district was the product of a legislative desire "to create a majority [B]lack district"]; *Abbott, supra*, 585 U.S. at p. 620 [Texas did not dispute that race was the predominant factor in the design of district "HD90" in light of legislative maneuvers intended to "increase[ ] the Latino population of the district in an effort to make it a Latino opportunity district" that included remediating the relocation of a predominantly African American community by "mov[ing] Latinos into the district to bring the Latino population back above 50 [percent]"]; *Alexander, supra*, 602 U.S. at p. 8 [hypothetical example of direct evidence of racial predominance included " 'scores of leaked e-mails from state officials instructing their mapmaker to pack as many [B]lack voters as possible into a district' "].) These cases do not show the commissioner statements about Rancho San Diego are of such a character as to require a judicial determination the Coalition met its burden to prove race was the predominant factor that motivated the design of the central district as a whole.

The same is true of the federal district court cases cited by the Coalition; they are factually distinguishable. (See, e.g., *Callais v. Landry* (W.D.La. 2024) 732 F.Supp.3d 574, 605 [quoting statements of legislators showing their intent was to create " 'majority-Black districts' " and " 'to draw a new Black district' "]; *Grace, Inc. v. City of Miami* (S.D.Fla. 2024) 730 F.Supp.3d 1245, 1260 [identifying "the vast number of occasions where direct evidence demonstrates the Commissioners' clear intent to design *each district* based on race" (italics added)]; *Jacksonville Branch of the NAACP v. City of*

41

*Jacksonville* (M.D.Fla. 2022) 635 F.Supp.3d 1229, 1291–1294 [evidence "point[ing] toward race" included statements of official reflecting view that "minority access districts, with significant Black voter majorities, must be maintained"]; *Bethune-Hill v. Va. State Bd. of Elections* (E.D.Va. 2018) 326 F.Supp.3d 128, 175 [unequivocal testimony admitting changes to districts were made for the "purpose of increasing the BVAP" in those districts was " 'direct evidence going to legislative purpose' " that corroborated a pattern of racial predominance illustrated by statistical data]; *Covington, supra*, 316 F.R.D. at pp. 148–149 [concluding race explained a district's contours where "almost every mile" of proposed district boundaries was changed to achieve a target percentage of " 'the [B]lack voting-age population in the district' " and the redistricting was determined to have removed a White political incumbent for reasons of her race based on evidence she defeated African American candidates].) Moreover, these district court cases only demonstrate what the factfinder decided in the first instance on the basis of different facts. They are not persuasive authority for the proposition a trial court commits reversible error when it fails to find racial predominance based on statements like those the Coalition cites here.

In short, we are not persuaded that the trial court erred when it found the Coalition failed to meet its burden to prove racial predominance.

C. *The Coalition Fails To Show the Redistricting Was Arbitrary and Capricious Such That It Was Entitled to Writ Relief*

As an independent basis for mandamus relief, the Coalition argued in its writ motion that "the redistricting" was arbitrary and capricious because the IRC (1) improperly elevated the principle of territorial compactness over consideration of communities of interest, (2) violated the timing requirement for the initial publication of draft maps, (3) and focused on protecting "African[ ]American, Arab[ ]Muslim, or other BIPOC communities" without

42

"actually benefiting the BIPOC community" and simultaneously "hurt[ing] the Chaldean community."

The trial court found the Coalition failed to show the IRC acted arbitrarily or capriciously or there was no reasonable basis for its actions. It stated the IRC did not elevate compactness over minimizing division of communities of interest or publish its first draft map too early. And it rejected the Coalition's argument about the IRC's asserted failures with respect to the identified communities for two main reasons. The first reason was factual: the court found the Coalition's claim that "African[ ]American, Arab[ ]Muslim, or other BIPOC communities" were not benefitted to be inconsistent with evidence in the administrative record. It also questioned the accuracy of the Coalition's claim there were "more Chaldeans in Rancho San Diego than members of these other groups," and reasoned that even if accurate it failed to show "other communities" did not benefit from Rancho San Diego being placed in the [c]entral [d]istrict. The court's second reason was legal. It explained the Coalition's stated goal in seeking mandamus was "to be placed in the supervisorial district where the Chaldean community aligns with the majority of voters—the East County District which has long been represented by a conservative supervisor." The court found this goal violated Elections Code section 21552, subdivision (a)(4), which mandates that "[c]ommunities of interest shall not include relationships with political parties, incumbents, or political candidates," and was not otherwise authorized by the VRA nor the Equal Protection Clause.

On appeal, the Coalition challenges the trial court's rejection of its third argument in favor of mandamus relief. It contends the court erred when it questioned the accuracy of its "numbers." It disputes the court's conclusion that communities other than the Chaldean community were not

43

shown to have derived a benefit from the placement of Rancho San Diego. It claims the conclusion is incorrect because there are "at best[ ] 400 African[ ]American individuals" in Rancho San Diego.

The Coalition's argument fails because it does not articulate a basis for reversing the trial court's decision. "It is the appellant's burden to demonstrate the existence of reversible error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766; accord, *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 89.) As we have explained, the court gave two independent reasons for rejecting the Coalition's claim. The Coalition addresses the first rationale, but not the second, which independently supports the judgment. Therefore, even if we were to sustain its challenge, we would not reverse the court's decision.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


DO, J.

WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.

44

Figure 1.



Figure 2a (draft map 1).



46

Figure 2b (draft map 2).



Figure 2c (draft map 3).



Figure 2d (draft map 4).



49

Figure 3.



Figure 4.



51

Figure 5.

